964 F.2d 1455
 Mary SUMMER RAIN; Jan Carlton; John Nelson; David A.
Cherry; Catherine Ann Lake; Lawrence M. Steinhart;
Leonard Chetkin; John James Scialdone; Winter Robinson;
Colleen Doran; Jean N. Campbell; Elizabeth Marlow,
Plaintiffs Appellees,
v.
THE DONNING COMPANY/PUBLISHERS, INCORPORATED; Walsworth
Publishing, Incorporated; Richard Mull; Donald
O. Walsworth; Stanley Hainer,
Defendants Appellants,
and
Schiffer Publishing Limited; Peter B. Schiffer, Defendants.
Mary SUMMER RAIN; Jan Carlton; John Nelson; David A.
Cherry; Catherine Ann Lake; Lawrence M. Steinhart;
Leonard Chetkin; John James Scialdone; Winter Robinson,
a/k/a Theresa Winter, a/k/a Theresa Winter Pope; Colleen
Doran; Jean N. Campbell; Elizabeth Marlow, a/k/a Mary
Elizabeth Marlow, Plaintiffs Appellees,
v.
SCHIFFER PUBLISHING LIMITED; Peter B. Schiffer, Defendants Appellants,
and
The Donning Company/Publishers, Incorporated; Walsworth
Publishing, Incorporated; Richard Mull; Donald
O. Walsworth; Stanley Hainer, Defendants.
 Nos. 91-2372, 91-2375.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1992.
Decided May 28, 1992.
As Amended June 23, 1992.
 
 Brant Mitchell Laue, Stinson, Mag & Fizzell, Kansas City, Mo., argued (Stephen J. Owens, Kansas City, Mo., Stanley G. Barr, Stephen E. Story, Kaufman & Canoles, Conrad M. Shumadine, Willcox & Savage, P.C., Norfolk, Va., on brief), for defendants-appellants.
 John Warren Hart, Beaton & Hart, P.C., Virginia Beach, Va., argued (Morris J. Keller, on brief), for plaintiff-appellees.
 Before WIDENER and LUTTIG, Circuit Judges, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 Appellees are a group of authors (the Authors) who have publishing contracts with the Donning Company. Appellants are Donning, its parent company Walsworth Publishing, Schiffer Publishing, as well as certain officers of Donning and Walsworth, and Schiffer Publishing's CEO, Peter Schiffer (collectively the defendants).
 
 
 2
 The Authors filed this action in the Eastern District of Virginia. They challenge the Donning Company's sale of certain rights in their books and certain book inventories to Schiffer Publishing. The Authors allege that the sale constituted a breach of their publishing contracts with Donning, and that the defendants committed various civil wrongs including conspiracy, tortious interference with contractual relations, fraud, violations of RICO, copyright infringement and conversion.
 
 
 3
 All of the publishing contracts contain an arbitration clause. The defendants moved the district court to stay the case pending arbitration but the district court denied their motion.[1] Defendants appeal and we now affirm in part, but vacate in part, and remand.
 
 
 4
 Each of the Authors' publishing contracts contains an arbitration clause providing as follows:
 
 
 5
 Any controversy or claim arising out of this agreement or breach thereof shall be settled by arbitration in accordance with the rules then in force of the American Arbitration Association, and judgment on the award may be entered in the highest court of the forum, state or federal, having jurisdiction. Arbitration shall be held in the City of Norfolk, Commonwealth of Virginia, unless otherwise agreed by the parties. In case of failure to pay royalties, Author may, at Author's option, refuse to arbitrate and may pursue remedies at law or in equity.
 
 
 6
 (emphasis added).
 
 
 7
 The contracts also contain four other provisions which should be noted here. First, a subsection of the "Royalties" section deals with reprint rights. The reprint rights provision grants the publisher "the sole and exclusive right to sell reprint and translation rights in and to the work in book or serial form (full-length, condensed or abridged versions)." The author is to receive a royalty of 50% of "net receipts" on reprints. Second, the contracts provide a special royalty rate of 10%, 12% or 15% of "actual cash received by Publisher" for copies sold at a discount of 50% or greater.[2] In contrast to these first two provisions, royalties on ordinary sales are based on the retail price of copies sold. Third, the contracts contain an anti-assignment clause, which provides that "no assignment, voluntary or by operation of law, shall be binding on either of the parties without the written consent of the other party hereto." Fourth, the section headed "Accounting & Payments" provides in part as follows:
 
 
 8
 (A) Publisher agrees to render statements semi-annually ... showing an account of books actually sold [during the period]. The statement, which shall be accompanied by any payments due to Author by Publisher, shall [contain certain specified information relating to book sales]....
 
 
 9
 (B) Author shall have the right not more than once in any year, at his/her expense, ... to have the books and records of Publisher relevant to statements rendered under this Agreement covering the preceding two (2) years examined by a certified public accountant and to obtain extracts or photocopies of portions of such books and records....[3]
 
 
 10
 The district court interpreted the arbitration clause to exempt from the requirement of arbitration any cause of action that "involves failure to pay royalties as an essential element." The district court relied upon the intertwining doctrine. It found that the arbitrable and nonarbitrable issues were "inextricably intertwined" and that it might, at its option, (1) stay arbitration where resolution of the nonarbitrable issues will resolve the arbitrable issues, (2) stay litigation where resolution of the arbitrable issues will resolve nonarbitrable issues, or (3) hear both the arbitrable issues and nonarbitrable issues. It chose the third option. It applied these principles to each count of the Authors' 16-count complaint, denied the defendants' motion to stay the litigation pending arbitration as to all 16 counts of the Authors' complaint, and set the case for trial.
 
 
 11
 Resolution of this appeal requires a general examination of the 16 claims[4] asserted in the Authors' complaint.
 
 
 12
 Count One alleges that the following acts resulted in a breach of the Authors' publishing contracts with Donning: assignment of publishing rights to Schiffer Publishing without the Authors' consent; Donning's failure to provide marketing and advertising personnel and to retain the right to direct promotion of the Authors' books; failure to provide proper royalty account statements to any of the Authors with the exception of Mary Summer Rain; failure to pay royalties; sale of Donning's entire inventory of Authors' books.
 
 
 13
 Count Two alleges that Donning's refusal to provide a copy to Winter Robinson, one of the authors, of any contracts transferring rights between Donning and Schiffer was a breach of her publishing contract.
 
 
 14
 Count Three alleges that Schiffer Publishing's failure to place a copyright notice on 60,000 volumes of Mary Summer Rain's books was a breach of her publishing contract.
 
 
 15
 Count Four alleges that Donning improperly deducted certain royalties from the account of Jan Carlton, one of the authors, in breach of her publishing contract.
 
 
 16
 Count Five alleges that the defendants' actions in causing Donning to assign the Authors' publishing contracts to Schiffer Publishing was a conspiracy to cause a breach of those contracts.
 
 
 17
 Count Six alleges that certain defendants' actions in forcing Donning to breach the Authors' contracts was a tortious interference with the contractual relationship between Donning and the Authors.
 
 
 18
 Count Seven alleges that the defendants' actions with respect to the contracts in question were a fraud against all of the Authors.
 
 
 19
 Counts Eight through Twelve allege that certain actions of the defendants with respect to these actions under the contracts in question amounted to fraud against those authors.
 
 
 20
 Count Thirteen alleges that the defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO) by sending letters and making telephone conversations in furtherance of their scheme to defraud the Authors.
 
 
 21
 Count Fourteen alleges that the defendants conspired to commit copyright infringement by causing an assignment of the Authors' publishing contracts in violation of the terms of those contracts.
 
 
 22
 Count Fifteen alleges that all of the defendants entered into the transaction with knowledge that Schiffer Publishing would infringe the Authors' copyrights by publishing their books in violation of the terms of their publishing contracts, and that Schiffer Publishing actually infringed the Authors' copyrights by printing, marketing and selling their books, and by printing new editions of their books, without their consent and in violation of their publishing contracts with Donning.
 
 
 23
 Count Sixteen alleges that the actions of the defendants with respect to the contracts involved amount to a conversion of the Authors' rights under the publishing contracts.
 
 
 24
 In addition, the complaint makes a number of general factual allegations. Of particular relevance, the complaint alleges that Donning transferred all of the current inventory of the Authors' books to Schiffer at discounts of 70% to 85% so that Schiffer could resell these books at their full value without paying any additional royalties to the Authors. The complaint also alleges that Schiffer agreed to pay Donning royalties to be computed on the wholesale selling price, instead of the retail price as required by the Authors' contracts with Donning, and that Donning planned to pay the Authors only one-half of the royalties received from Schiffer as a reprint, also in violation of the Authors' publishing contracts. Finally, the complaint alleges that the defendants entered into the Donning/Schiffer agreement "in spite of the fact that the royalty schedule contained in such agreements would result in the Plaintiffs receipt of a fraction of the royalties they would have otherwise received had the rights not been assigned."
 
 
 25
 The principal, and perhaps the only, underlying dispute in this case is much simpler than this multitude of claims and allegations would make it appear, however. The Authors conceded at oral argument[5], and we find upon our review of the complaint, that the gravamen of their claims, with the exception of count four, is that the defendants breached the anti-assignment, reprint rights, and perhaps other similar provisions of the Authors' contracts. In its simplest terms, the heart of the dispute between the Authors and the defendants is a disagreement as to whether the transaction between Donning/Walsworth and Schiffer Publishing was a permissible transaction such as a permissible sale of reprint rights, for example, or an impermissible assignment of the Authors' contracts. With the exception of count four, the Authors' claims will largely stand or fall on the decision of this issue.
 
 
 26
 Section 3 of the Arbitration Act, 9 U.S.C. § 3, directs a district court to stay the trial of any suit or proceeding "upon any issue referable to arbitration" under an arbitration agreement until the arbitration "has been had" in accordance with the arbitration agreement. When there is a dispute as to the scope of the arbitration agreement, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator, "[u]nless the parties clearly and unmistakably provide otherwise." AT & T Technologies v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). Determination of the arbitrability of a dispute is subject to de novo review. Kansas Gas & Elec. Co. v. Westinghouse Elec. Corp., 861 F.2d 420, 422 (4th Cir.1988).
 
 
 27
 Because section 3 provides the right to a stay only on an issue "referable to arbitration under an agreement in writing for such arbitration," our task primarily is one of contract interpretation. However, 9 U.S.C. § 2 of the Arbitration Act creates a "body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). In construing an arbitration agreement within the coverage of the Act, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). The Court recently summarized Moses H. Cone and Mitsubishi as "establish[ing] that, in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, [citation omitted], due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Volt Info. Sciences v. Leland Stanford Jr. U., 489 U.S. 468, 475-76, 109 S.Ct. 1248, 1253-54, 103 L.Ed.2d 488 (1989). As well, certain other principles should be discussed prior to applying the law to the facts of this case.
 
 
 28
 The Authors argue that, because the arbitration clause provides that in case of failure to pay royalties the author "may pursue remedies at law or in equity," the phrase "case of failure to pay royalties" was intended to include a broad range of legal and equitable actions. We disagree. In our view the proper interpretation is that that provision for legal and equitable relief was intended to allow the author to enforce the "Accounting & Payments" provision by prosecuting an action at law or cause in equity to collect unpaid royalties, either legal or equitable relief being available in Virginia for a failure to account. See Boyd, Burks Pleading and Practice § 102 (4th ed. 1952); IV Minor, Institutes of Common and Statute Law 1221 (2nd ed. 1883). See generally 1A Michie's Jurisprudence of Virginia and West Virginia, Accounts & Accounting § 15 (1980).
 
 
 29
 The district court erred in its reliance on the intertwining doctrine. Courts that followed the intertwining doctrine held that "[w]hen arbitrable and nonarbitrable claims arise out of the same transaction, and are sufficiently intertwined factually and legally, the district court ... [could] in its discretion deny arbitration as to the arbitrable claims and try all the claims together in federal court." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 216-17, 105 S.Ct. 1238, 1240, 84 L.Ed.2d 158 (1985). However, we think the Court rejected the intertwining doctrine in Byrd, in its holding that "the Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." Id. at 217, 105 S.Ct. at 1241. Contrary to the district court's reasoning, therefore, the fact that the matters to be arbitrated may be "intertwined factually and legally" with the matters to be decided by the district court no longer presents an obstacle to arbitration of the arbitrable matters.
 
 
 30
 Byrd also speaks to the separation of arbitrable "claims" from non-arbitrable ones. Applying the arbitration clause in the Authors' contracts, by contrast, would require the separation of arbitrable "issues" from non-arbitrable ones. Specifically, it would require, for example, that the non-arbitrable issue of the determination of royalty amounts due to the Authors under their contracts be decided by the district court if the arbitrable breach of contract issues are decided in favor of the Authors. Notwithstanding the reference to "claims" in Byrd, we are of opinion that the Arbitration Act requires the separation of arbitrable "issues" from non-arbitrable ones, and that there is no difference in the "claim" referred to in Byrd and "issue" referred to in the statute. First, the Act indeed, speaks in terms of "issues."
 
 
 31
 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
 
 
 32
 9 U.S.C. § 3. The plain words of the Act therefore suggest that arbitrability is to be determined on an issue-by-issue basis, without regard to the way that the issues are grouped into claims. In Byrd, the party seeking arbitration had moved to sever the pendent state claims from the federal securities claim, to compel arbitration of the state claims, but to stay the arbitration pending the litigation. The Court, therefore, was not squarely presented with the question of whether the Arbitration Act allows the severance of arbitrable issues from non-arbitrable ones. We are of opinion, however, that in using the term "claims," the Court in Byrd did not intend to change the plain meaning of the Arbitration Act, which speaks in terms of "issues," but meant to equate "claims" with "issues" as we do.
 
 
 33
 We also address the order in which the arbitration and the litigation should proceed. The decision whether to stay the litigation of the non-arbitrable issues is a matter largely within the district court's discretion to control its docket. See Moses H. Cone, supra 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. This remains true even after the Supreme Court's decision in Byrd. See Genesco, Inc. v. T. Kakiuchi & Co. Ltd., 815 F.2d 840, 856 (2d Cir.1987). Because it will not be necessary for the district court to render a decision on the non-arbitrable issue of the determination of royalty amounts if the arbitrable issues are decided in favor of the defendants, we are of opinion that litigation on the non-arbitrable issues which depend on arbitrable issues should be stayed pending arbitration.
 
 
 34
 Finally, we are of opinion that the district court has the power to frame the precise questions to be answered by the arbitrators. See L.O. Koven & Brother, Inc. v. Local Union No. 5767, United Steelworkers, 381 F.2d 196, 202 n. 23 (3d Cir.1967); Socony Vacuum Tanker Men's Ass'n v. Socony Mobil Oil Co., 369 F.2d 480, 482 (2d Cir.1966). Because the facts of this case present arbitrable issues that are intertwined with those which are non-arbitrable, the Court's decision in Byrd requiring courts to separate the arbitrable from the non-arbitrable necessarily requires that the district courts have the power to define the arbitrable issues. To send a case such as this to arbitration without first framing the issues to be arbitrated would invite confusion and also additional litigation after rather than before the arbitration.
 
 
 35
 Applying the principles stated above, and referring for convenience to the claims we have abstracted above as asserted in the authors' complaint as enumerated in counts 1 through 16, we are of opinion that the claim stated in count 4 is non-arbitrable. So litigation may proceed on that count without regard to the arbitration, if the district court in its discretion thinks that is appropriate. The claims contained in counts 2 through 16, count 4 excepted, all should be submitted to arbitration. The claims in count 1 should be submitted to arbitration with the exception of the failure to pay royalties and to provide proper royalty account statements, which are not subject to arbitration, being a part of the obligation to account as well as payment.
 
 
 36
 In sum, this is a classic case of intertwining, for nearly all of the substantive disputes between the parties would end up with greater or lesser amounts of royalties due, depending on their disposition. Since reliance on the intertwining doctrine, however, is no longer permissible so as to bring the entire dispute to litigation at once, we must give effect to the Court's admonition in Volt Info. Sciences and resolve ambiguities in favor of arbitration. Therefore, since ascertainment of monies due the authors is subject to the resolution of arbitrable claims, such ascertainment, with the exception of count 4, must await the result of the arbitration. Even if whether any royalty may be due is arbitrable, ascertainment of the amount due in each case is not arbitrable.
 
 
 37
 With the exception of a trial on count 4, the judgment of the district court must be vacated and the case remanded for proceedings not inconsistent with this opinion.
 
 AFFIRMED IN PART AND VACATED AND REMANDED.[6]
 
 
 [1]
 The district court also denied the defendants' motion to stay the case pending appeal
 
 
 [2]
 At least one of the contracts does not contain a special royalty provision dealing with severely discounted sales
 
 
 [3]
 In one of the contracts, the language of this clause differs, but is to the same general effect as the language quoted herein
 
 
 [4]
 We do not use "claims" here as any word of art, rather in the sense of the assertion of a cause of action against the defendants
 
 
 [5]
 Authors' Counsel: ... Our problem with this particular case is that these are inextricably intertwined. We can't--it has to be one or the other. We can't separate these particular issues
 The Court: What if you let them arbitrate whether this selling the reprint rights was a breach of contract--and say that the arbitrators shall answer that question yes or no--was or wasn't--and then the rest of the case is litigated in the district court.
 Authors' Counsel: Well, Your Honor that--that is still seems to violate the arbitration exclusion because--simply because this breach of contract, whether a sale of reprint rights or an assignment of contract still resulted in failure--in case--this still is a case of failure to pay royalties. And a case of failure to pay royalties--
 The Court: Well, all of them are going to be--every--every breach of contract is going to be--you, you wouldn't be here if--If the authors were getting their royalties, they wouldn't have filed any lawsuit.
 Authors' Counsel: Well, Your Honor. Your Honor, with all due respect, if--there is a scenario where if they were getting their royalties this lawsuit would still be going on, and that is if they had assigned, if the contract had been assigned, and the authors were getting all of their royalties due under the contract, their objection being the identity of the publisher, instead--and the damages would relate to the identity of the publisher, what the publisher does for their books, instead of failure to pay royalties. Um, there are provisions under the arbitration provision. There are scenarios under that arbitration provision--
 The Court: So they say we'd rather be published by Houghton Mifflin than Bantam Books, and we're going to have it that way.
 Authors' Counsel: Correct, in a scenario of that nature then arbitration would be the only remedy available to the appellees in this matter. However, since there is an exclusion for "in case of failure to pay royalties," and when one pursues an action for failure to pay royalties the issue involved is what caused the failure to pay royalties. Was it breach of contract? Was it fraud? Was it copyright infringement? And that's what we're arguing at this point, that we're looking at the cause of the failure to pay royalties because it is related to the case of failure to pay royalties.
 The Court: Why couldn't the arbitrators arbitrate, then, the question: when Donning sold the reprint rights, whether or not that's a breach of contract, answer yes or no. And then the district court would have to take the yes or no answer and ascertain whether or not there were any overdue royalty payments.
 Authors' Counsel: Well, Your Honor is--um--
 The Court: Sort of like a special verdict.
 Authors' Counsel: That's something that I--I had not thought of--similar to a commissioner in chancery I suppose under the Virginia system. Um--But the fact remains that the sale of reprint rights does affect royalties. And, we're alleging that that's a "case of failure to pay royalties," still.
 The Court: Why couldn't they say that it was a breach of contract to sell the reprint rights, then let--let the rest of the case be decided in the district court.
 Authors' Counsel: Well, Your Honor that--we assert that that's in violation of the plaintiffs'--that deprives the plaintiffs of their right to pursue their remedy at law.
 The Court: I understand. But otherwise you're going to deprive the publishers of their right to pursue the breach of contract by arbitration.
 Authors' Counsel: Well, Your Honor, if--if this case did not involve failure to pay royalties, then everyone would have the right to arbitrate. The fact is that this does--that this case does--that this is a case of failure to pay royalties and, therefore, the publishing contracts control and its a right that was bargained away by the publishers with the execution of the contract.
 The Court: Well, they say, and I take it they imply, that the only real question is whether when Donning sold the reprint rights and the book inventory that that was a breach of the contract, that everything else must stand or fall with that. Is that correct?
 Authors' Counsel: Um. Without--without giving away all of my case--
 The Court: I understand.
 Authors' Counsel: --which are still going on, it--its--um--
 The Court: It's essentially--
 Authors' Counsel: it's a decid--That is correct, Your Honor. Um--the--um--whether a breach of the assignment provision of the contract occurred. And in case that breach of the assignment provision resulted in--makes this a "case of failure to pay royalties."
 The Court: All right, your red light is on.
 Authors' Counsel: Thank you very much, Your Honor.
 
 
 [6]
 It is important to note, we feel, that, by requesting arbitration and prosecuting this suit to compel it, all of the defendants have waived any argument that, because they are not parties to the agreement containing the arbitration clause, they are not bound by the arbitrators' decision. See Local 1020 v. FMC Corp., 658 F.2d 1285, 1295 (9th Cir.1981) ("While [the] Carpenters [union], not having been a signator to the Pacific Coast Master Agreement, perhaps could have declined arbitration in the first instance, it is too late for Carpenters to complain after having voluntarily agreed to arbitrate and having participated therein without objection.")