**A.M. CASTLE & CO., Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, Defendant.**

No. 94 CV 6857.

United States District Court, Northern District of Illinois, Eastern Division.

July 21, 1995.

Harry M. Sangerman, David Brian Montgomery, McDermott, Will & Emery, Chicago, Illinois, Jerry M. Aufax, Franklin Park, Illinois, for plaintiffs A.M. Castle Co.

William Schmelling, United Steelworkers of America, Chicago, Illinois, Jeffrey Van Horne, Rudolph L. Milasich, United Steelworkers of America, U.S. Department of Justice, Tax Division, Washington, DC, for defendant United Steelworkers of America.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

A.M. Castle & Co. (Castle), a manufacturer of metal products, brings this action against the United Steelworkers of America (USWA), a union representing workers at several of Castle's plants. In 1993, Castle and USWA signed a collective bargaining agreement that included a provision for a 401(k) plan to be made available to USWA members working for Castle. In a five-count complaint Castle seeks a declaration that the 401(k) provision is void. USWA has moved for summary judgment, arguing that the collective bargaining agreement requires Castle and USWA to submit their dispute to arbitration rather than seek judicial resolution. USWA has also asked the court to assess sanctions against Castle and its attorneys under both Rule 11 and § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. For the reasons set forth below, USWA's motion for summary judgment is granted and its motions for sanctions are denied.

### FACTS [1]

In August 1992, Castle and USWA began collective bargaining to negotiate an employment contract for USWA's members. One of USWA's proposals was the adoption of the "United Steelworkers of America Saving Program—401(k) Plan" (the 401(k) Plan). After some discussions Castle tentatively agreed to the proposal on September 25, 1992. There were no further discussions concerning the 401(k) Plan until well after the parties signed the entire collective bargaining agreement on May 1, 1993.

---

1. Summary judgment is appropriate only if there is no reasonable reading of the facts under which the nonmoving party could prevail. Therefore we read all facts in the light most favorable to the nonmoving party.

The trouble began in March 1994, when USWA for the first time sent Castle a package of documents purportedly constituting the 401(k) Plan. Castle objected that this plan was not what had been agreed to the previous year. In particular, the plan was not one that USWA already had in place, as Castle expected; it was a model plan that Castle was to adopt as its own, with assistance from Connecticut General Life Insurance Company (CIGNA). Under USWA's plan, Castle would be the primary fiduciary and the plan administrator. Although CIGNA would also be a plan administrator, it would have no fiduciary duties, and Castle would be responsible for filing a summary plan description with the Department of Labor and obtaining a favorable Internal Revenue Service determination. Castle had apparently thought that its duties under the 401(k) Plan would be limited to making payroll deductions—a small and nearly risk-free role compared with that embodied in the actual plan. In letters to USWA in June and July 1994, Castle objected to what it perceived as a bait-and-switch. On August 15, 1994, the parties met and attempted to resolve their differences over the 401(k) Plan. They failed to do so.

On November 4, 1994, USWA submitted a grievance to Castle for processing under the collective bargaining agreement. USWA complained that Castle had failed to implement the 401(k) Plan as promised in the agreement. Castle responded that the grievance was not cognizable under the agreement because the 401(k) Plan provision is unenforceable. It then filed suit seeking a declaration to that effect.

Castle presents five arguments in support of its position: (1) there was no meeting of the minds concerning the 401(k) Plan; (2) the Plan violates § 302 of the National Labor Relations Act (NLRA); (3) USWA fraudulently induced Castle to agree to the Plan; (4) USWA negligently misrepresented the nature of the Plan; and (5) USWA breached the agreement concerning the Plan. USWA denies these charges and further argues that under the agreement Castle's case cannot be brought in federal court at all but must be arbitrated. Along with its motion for summary judgment USWA has moved for sanctions, arguing that Castle's suit is unwarranted and "brought for the improper purpose of causing unnecessary delay" (USWA's Mot. for Sanctions at 1).

## DISCUSSION

The central question facing us is whether the parties' dispute should be heard by a court or by an arbitrator. That question is most clearly raised by count I of Castle's complaint, and our ruling with respect to count I affects our decisions on the other counts. We therefore begin with count I, then address the other counts in turn. We save the motions for sanctions for last.

### I. Count I: No Meeting of the Minds

USWA argues that because Castle agreed to binding arbitration when it signed the collective bargaining agreement, it "must arbitrate all disputes arising concerning the application and interpretation of that [agreement]," including the 401(k) Plan provisions (USWA Mem. at 7). Castle responds that because the collective bargaining agreement was based on a mutual misunderstanding about the nature of the 401(k) Plan provisions, the parties had no meeting of the minds and there is no contract to arbitrate. Both parties rely on recent Seventh Circuit cases to support their positions—in particular, *Colfax Envelope Corp. v. Local No. 458–3M, Chicago Graphic Communications International Union*, 20 F.3d 750 (7th Cir. 1994), and *Johnson Controls, Inc., Systems and Services Division v. United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry*, 39 F.3d 821 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995). Because we agree with the parties that *Colfax* and *Johnson* govern this dispute, we begin our analysis with an examination of both cases.

### A. Colfax

*Colfax* involved a collective bargaining agreement between Colfax, an envelope manufacturer that used printing presses to print on some of its envelopes, and a printers' union. The provision at issue concerned the

number of workers required to operate various printing presses. At the beginning of its 1991 negotiations with Colfax the union submitted a summary of its proposed changes to the existing contract. Although the summary did not say how many workers would be required to operate the type of press Colfax used, Colfax took it to mean that only three workers would be required and accepted the union's proposal. When the final agreement arrived, Colfax realized that the requirements set forth therein were not what it had expected: its presses would actually require four men. Colfax refused to sign the final agreement, but the union maintained that Colfax's acceptance of the summary bound it to the final agreement. Colfax sued, seeking a declaration that there was no collective bargaining agreement because the parties failed to agree on an essential term—the staffing requirements for Colfax's presses. The union responded that the dispute should be arbitrated because Colfax had accepted the new contract, which required arbitration of any dispute " 'arising out of the application or interpretation of this contract.' " *Colfax*, 20 F.3d at 752 (quoting the agreement).

In a complex and interesting decision comprised of three separate opinions, the Seventh Circuit ruled in favor of the union. Judge Posner's majority opinion first addressed Colfax's claim that there had been no meeting of the minds. He noted that the very term "meeting of the minds" is misleading: "Most contract disputes arise because the parties did not foresee and provide for some contingency that has now materialized—so there was no meeting of the minds on the matter at issue—yet such disputes are treated as disputes over contractual meaning, not as grounds for rescinding the contract." *Id.* A better term for "no meeting of the minds" would be "latent ambiguity," in the sense that neither party is aware that the contract is ambiguous. *Id.* at 753. When a latent ambiguity exists, "[i]f neither party can be assigned the greater blame for the misunderstanding, there is no nonarbitrary basis for deciding which party's understand-

ing to enforce, so the parties are allowed to abandon the contract without liability." *Id.*[2] Latent ambiguities are not to be confused with patent ambiguities: in the latter situation, the parties should know that the contract is unclear and in agreeing to it anyway merely "gamble on a favorable interpretation by the authorized tribunal should a dispute arise." *Id.* at 753, 754.

Having enunciated these general principles, Judge Posner turned to the case before him. He held that "Colfax, if reasonable, could not have doubted from reading the summary [submitted by the union] that interpretations of the kind that the union and the district judge later placed upon it would be entirely plausible." *Id.* at 754. Therefore, the parties' agreement contained a patent ambiguity (the failure of the summary to specify the staffing requirements for Colfax's particular machines) and the interpretation of its true meaning would be left to the authorized tribunal: the arbitrator. *Id.*

But Judge Posner did not stop there. He noted that the outcome would be different had the arbitration clause itself (as opposed to some other aspect of the agreement) been ambiguous. Interpretation of that part of the agreement would be a task for the court. *Id.* An arbitration clause is not invalidated simply because it is part of a contract that is otherwise voidable, "perhaps because fraudulently induced." *Id.* Rather, "[t]he party [seeking to avoid arbitration] must show that the arbitration clause itself, which is to say the parties' agreement to arbitrate any disputes over the contract that might arise, is vitiated by fraud, or lack of consideration or assent . . .; that in short the parties never agreed to arbitrate their disputes." *Id.* Thus if the arbitration clause is valid, "the only question is whether [the parties'] dispute . . . [is] a dispute over the meaning of their contract"; if so, it must be arbitrated. *Id.*

Judge Posner concluded with a related point that is critical to the case before us:

---

**2.** Presumably, where the parties are not equally blameworthy, the less blameworthy party is entitled to have the contract reformed or interpreted

to match its perception of what agreement had been reached.

Even if ... there was no 'meeting of the minds' (in the artificial sense in which the law of contracts uses the term) on the [staffing] requirements in the 1991 agreement, there was a meeting of the minds on the mode of arbitrating disputes between the parties arising from any collective bargaining contract ... that Colfax signed.... [A] contract dispute is arbitrable even if one party argues that the contract should be rescinded because it does not express an actual agreement of the parties, for example because it was induced by fraud. All that is important is that the parties have agreed that arbitration rather than adjudication would be the mode of resolving their disputes.

*Id.* at 755. Thus the district court's conclusion that the provision at issue bore a particular meaning did not bind the arbitrator; Colfax was free to argue in the arbitration hearing that, "under a proper interpretation of the contract, there really was no meeting of the minds over the [staffing] requirements and therefore that the contract should be rescinded after all. The only essential point at this stage of the litigation is that whether or not there was ... such a meeting of the minds, there was sufficient mutual understanding to create an enforceable contract to submit the issue to arbitration." *Id.*

In his concurring opinion, Judge Cudahy agreed with Judge Posner's exposition of the nuances of the term "meeting of the minds." But he felt that the case could be resolved more simply: "It is clear enough that Colfax's acceptance of the summary settlement agreement *unambiguously* supports the Union's position that there *is* a collective bargaining agreement containing an arbitration clause and that the meaning of the contract terms should therefore be submitted to arbitration." *Id.* at 756 (Cudahy, J., concurring). In other words, Judge Cudahy believed that Judge Posner's second point was sufficient grounds for the decision.

Judge Cudahy went on to explain that the "meeting of the minds" doctrine had complicated the case because the judges espoused two views of it. Judge McDade, although concurring in the judgment, believed that absent a meeting of the minds, there was no contract between the parties. In other words, he thought that latent ambiguities raise questions of contract formation. Judge Posner, on the other hand, saw "meeting of the minds" as a metaphor: "where a court declares that there is no meeting of the minds, it is not *really* saying that there is no contractual relation between the parties, but simply declaring that it cannot discern a nonarbitrary way to decide whose interpretation is best. It therefore will not enforce either version, but will instead allow remedies of rescission and restitution, and send the parties their separate ways." *Id.* Although the question of whether a meeting of the minds is an element of a contract's formation or something to be considered when interpreting a contract does not make much difference in the usual contract case (because the tribunal entrusted with answering the formation question is also responsible for interpreting the contract), it is important in cases involving arbitration clauses. After all, if the "meeting of the minds" question is one of formation, an arbitrator who finds that the parties have not had a meeting of the minds would thereby strip himself of his authority—including the power to rescind the contract. Concluding that viewing "meeting of the minds" as a metaphor would avoid this situation and permit arbitrators to do their job of interpreting contracts, Judge Cudahy agreed with Judge Posner that the arbitrator in *Colfax* "could still find there to be no meeting of the minds, and therefore allow rescission and restitution." *Id.* at 757 (Cudahy, J., concurring).

It was on this last point that Judge McDade disagreed with his fellow judges. He felt that because the court had decided that there was a meeting of the minds, "it is beyond the purview of the arbitrator's function to decide the existence of a contract— her function is to apply and interpret the contract." *Id.* at 758 (McDade, J., concurring).

■ Although *Colfax* is an unusually complicated case, we can distill from it several rules. First, as a general matter of contract law, an ambiguous agreement can be either patently or latently ambiguous. Patent ambiguities (those in which "the ambiguity

arises from the language itself," *id.* at 757 (McDade, J., concurring)) are presumed to have been apparent to the parties at the time of the contract, and the tribunal charged with interpreting the contract does so based on evidence of the parties' intent. Latent ambiguities, which occur when the parties "agree to terms that reasonably appear to [both] of them to be unequivocal but are not," [3] leave the tribunal with no interpretive guidance and therefore are grounds for rescission.

▄ Second, "meeting of the minds" is an issue of contract interpretation, not of contract formation. Thus to say that there is a latent ambiguity is not to say that the parties have no contractual relation; it simply means that the court "cannot discern a nonarbitrary way to decide whose interpretation is best." *Id.* at 756 (Cudahy, J., concurring). In such situations the court "will not enforce either [party's] version, but will instead allow remedies of rescission and restitution, and send the parties their separate ways." *Id.* (Cudahy, J., concurring). This second rule, like the first, applies to all contracts.

▄ *Colfax*'s third and final rule is specific to contracts containing arbitration clauses. In such cases, *Colfax* says, courts should treat arbitration clauses differently from other clauses in a collective bargaining agreement. When evaluating an arbitration clause the court itself should interpret patent ambiguities or rescind on the basis of latent ambiguities, just as it does in a garden-variety contract case. This makes sense because "[t]he duty to arbitrate is contractual, and the interpretation of the contract [that establishes that duty (the arbitration clause)] is for the court." *Id.* at 754 (citing *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). The opposite is true for the other clauses in the agreement. Where a valid arbitration clause exists, the interpretation of *any other clause* in the agreement must be left to the arbitrator

because "all that is important is that the parties have agreed that arbitration rather than adjudication would be the mode of resolving their disputes." *Id.* at 755.

It should be noted that this last rule to some extent renders *Colfax* internally inconsistent. The court had already stated that because the ambiguity in the provision Colfax and the union were fighting about was patent, it was a matter of interpretation and should be left to the arbitrator. Now the court was saying that as long as the parties had agreed to arbitrate disputes arising from the contract (which they had), the resolution of such disputes must be left to the arbitrator, *regardless of whether the ambiguity underlying the dispute is latent or patent.*[4] The two statements at first seem to be merely alternative bases for the court's holding. But if the second statement is correct, the court had no need to inquire whether the provision was patently or latently ambiguous in the first place (because that was the arbitrator's domain).

## B. *Johnson*

*Johnson* was a dispute between Johnson Controls (Johnson), which manufactures pneumatic control systems, and a plumbing and pipefitting union. Johnson and the union disagreed about whether their collective bargaining agreement permitted Johnson to assign preventive maintenance work to non-bargaining unit employees. In 1989, the union filed grievances with Johnson and the parties went before an arbitrator, who found for the union. Johnson appealed the arbitrator's award to the district court. The court concluded that the arbitrator had found that there was no meeting of the minds between the parties and that this finding stripped him of any further authority. It therefore vacated the award and granted summary judgment for Johnson. 39 F.3d at 823–26.

The Seventh Circuit reversed. It rejected the district court's conclusion that "because

---

3. Although Judge Posner did not say as much, we believe that *Colfax*'s blameworthiness analysis, *see supra*, fits nicely into this definition. After all, if one party is to blame for an ambiguity (for example, because it failed to read the contract or committed fraud), we cannot say that it

reasonably considered the contract's terms to be unequivocal.

4. Note that this logic holds up only if one accepts *Colfax*'s earlier point that latent ambiguities raise interpretive questions, not formation questions.

the arbitrator found the parties came to no 'meeting of the minds' concerning the scope of Paragraph 13(1), further arbitration on this issue was beyond his authority." *Id.* at 825. Even assuming that the arbitrator had made that finding, the court said, that did not strip him of his power to interpret the provision. Rather, under *Colfax*, " '[w]hen parties agree to a patently ambiguous term, they submit to have any dispute over it resolved by interpretation.' . . . Only if the contract provision contains a 'latent ambiguity,' or, in other words, is the result of a mutual misunderstanding, is it subject to rescission and outside the arbitrator's interpretive authority." *Id.* (quoting *Colfax*, 20 F.3d at 754). Finding the provision at issue patently ambiguous,[5] the court held that the dispute was properly arbitrated.

## C. *Analysis*

*Colfax* leaves us in doubt about how to proceed in this case. Is its final rule (that any dispute arising from a contract containing a valid arbitration clause should be arbitrated) a holding or merely *dictum?* If it is *dictum*, should we follow it here?

*Johnson* did not clarify matters much. Although the court in that case made no attempt to weigh in on the intellectual debate found in *Colfax*, its statements indicate that it agreed with much of it but either disagreed with or misunderstood the *Colfax* analysis respecting latent ambiguities. The *Johnson* court focused on whether the ambiguity in the provision at issue was patent or latent, an issue that (according to the second part of *Colfax*) should have been left to the arbitrator. Moreover, in asserting that a provision containing a latent ambiguity is "outside the arbitrator's interpretive authority," 39 F.3d at 825, *Johnson* misstated one of *Colfax*'s key rules. Although *Colfax* does say that a latent ambiguity is grounds for rescission, nowhere does it say that a provision containing such an ambiguity cannot be interpreted by the arbitrator. In fact, both Judge Posner and Judge Cudahy rejected that view. *Colfax*, 20 F.3d at 755 ("It will . . . be open to Colfax to argue to the arbitrator that . . . there really was [a latent ambiguity] over the manning requirements and therefore that the contract should be rescinded after all."); *id.* at 756 (Cudahy, J., concurring) ("I . . . agree with Judge Posner that the arbitrator could . . . find there to be no meeting of the minds, and therefore allow rescission and restitution.").

*Colfax* and *Johnson* suggest no fewer than three routes we can take in this case.[6] First, we could confine the cases to their narrowest holding: that patent ambiguities should be resolved by the arbitrator.[7] Second, we could adopt *Colfax*'s *dictum* and hold that the parties' dispute must be heard by an arbitrator regardless of whether the ambiguity in the contract is patent or latent. Finally, we could follow *Johnson*'s true holding as well as its *dictum*, in which case we would rule that patent ambiguities are for the arbitrator while latent ambiguities are grounds for rescission by the court and are not sent to the arbitrator at all.

It may seem that if the ambiguity that troubles USWA and Castle is patent, we need not concern ourselves with the problem created by *Colfax* and *Johnson* because under both cases a patent ambiguity should be resolved by arbitration. But that is not so. We need to decide whether the *Colfax* *dictum*—which tells us to send all contractual disputes to the arbitrator if the contract contains a valid arbitration clause—is the law, because if it is we would be powerless to decide whether the ambiguity here is patent or latent.

---

5. The relevant paragraph of the agreement stated that " '[t]his Agreement covers the rates of pay, hours and working conditions of journeymen and apprentices engaged in the installation, service, and *maintenance of all plumbing and/or pipe fitting systems, including pneumatic controls and mechanical equipment* and component parts.' " 39 F.3d at 823 (quoting paragraph 13(1) of the agreement) (emphasis added by the court).

6. These options all depend on an initial finding that the arbitration clause is valid. The parties in this case do not dispute that fact.

7. Strictly speaking, the *Colfax* and *Johnson* courts had no holding with respect to latent ambiguities; because of their decision that the agreements before them contained patent ambiguities, they did not need to address whether latent ambiguities should be resolved by the arbitrator.

We are left, then, to try to discern a rule from the morass of *Colfax* and *Johnson*. In so doing, our task is to try to ascertain what the Seventh Circuit would do if squarely faced with the question. Based on the opinions in *Colfax*, the precedents cited therein and the strong policy favoring arbitration of labor disputes, we conclude that an arbitration clause is severable from the remainder of a collective bargaining agreement; that is, that disputes over provisions of a contract that also contains a valid arbitration clause must be arbitrated. We therefore follow *Colfax* in its entirety.

The majority in *Colfax*, perhaps caught up in its interest in making sense of the complicated "meeting of the minds" issue and the distinction between patent and latent ambiguities, overlooked the fact that the case could be decided without entering that thicket. After all, if the severability rule applied, it would not matter whether the ambiguity was latent or patent—as long as both latent and patent ambiguities were considered interpretive questions the dispute would be sent to the arbitrator without further inquiry. Despite this conceptual problem, it is apparent that both Judge Posner and Judge Cudahy believed that the arbitration clause was a sufficient basis for sustaining the grant of summary judgment against Colfax. *Id.* at 755 ("All that is important is that the parties have agreed that arbitration rather than adjudication would be the mode of resolving their disputes."); *id.* at 756 (Cudahy, J., concurring) ("It is clear enough that ... there *is* a collective bargaining agreement containing an arbitration clause and that the meaning of the contract terms should therefore be submitted to arbitration."). Although these passages are *dicta*, they are not just offhand remarks; they are supported by reasoning and citation to authority. We would thus be ill-advised to ignore them, especially since they are the best indication we have of the Seventh Circuit's view on the issue before us.

Even if we were more troubled by the nonbinding nature of the *Colfax* court's pronouncements, we could take comfort in the precedent *Colfax* cites to support the view that arbitration clauses are severable. Most important is the Supreme Court's decision in

*Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967), which stated that while a court faced with a contract containing an arbitration clause could consider claims of fraud in the inducement of an arbitration clause, it could not consider "claims of fraud in the inducement of the contract generally." *Id.* at 404, 87 S.Ct. at 1806. *Prima Paint* has been followed in the Seventh Circuit as well as its sister circuits, and it has been held to apply to attempts to rescind contracts on grounds other than fraud in the inducement. *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 868–69 (7th Cir. 1985) (adopting *Prima Paint*'s distinction between challenges to an arbitration clause and challenges to other aspects of the agreement); *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 818 (11th Cir.1993) (same); *Three Valleys Municipal Water District v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir.1991) ("though *Prima Paint* involved a charge of fraud in the inducement of the contract, the rationale of *Prima Paint* extends to attempts to rescind contracts on other grounds") (citing cases stating that claims of mutual mistake, frustration of purpose, duress, unconscionability, coercion, and confusion in signing are all matters for arbitration).

Castle argues that *Prima Paint* is inapposite because it was based on an interpretation of the Federal Arbitration Act, which does not apply to the arbitration provisions of collective bargaining agreements. *See* Castle Resp. at 5 (citing *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985)). But "although formally inapplicable to labor arbitration," the Arbitration Act "is used as a source of principles to guide the formulation of a federal common law of labor arbitration under section 301." *Glass, Molders, Pottery, Plastics and Allied Workers International Union v. Excelsior Foundry Co.*, 56 F.3d 844, 848 (7th Cir.1995); *see also United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 40 n. 9, 108 S.Ct. 364, 372 n. 9, 98 L.Ed.2d 286 (1987) ("The Arbitration Act does not apply to 'contracts of employment of ... workers en-

gaged in foreign or interstate commerce,' 9 U.S.C. § 1, but the federal courts have often looked to the Act for guidance in labor arbitration cases, especially in the wake of the holding that § 301 of the [LMRA] empowers the federal courts to fashion rules of federal common law to govern '[s]uits for violation of contracts between an employer and a labor organization' under the federal labor laws."); *American Postal Workers Union v. United States Postal Service,* 52 F.3d 359, 362 (D.C.Cir.1995) (Arbitration Act provides "guidance in fashioning federal common law governing suits for breach of contract ... under § 301 of the [LMRA]").

More importantly, the logic behind *Prima Paint* and its progeny applies to labor arbitration cases as well as Arbitration Act cases. *Matterhorn* explained that *Prima Paint's* distinction "between attacking the whole contract and just the arbitration clause" makes sense because "[i]f the agreement of one party to arbitrate disputes is fully supported by the other party's agreement to do likewise, there is no need to look elsewhere in the contract for consideration for the agreement to arbitrate; so objections to other parts of the contract, based on fraud or unconscionability or mistake or whatever, need not spill over to the arbitration clause." *Matterhorn,* 763 F.2d at 869. This statement makes as much sense in the labor arbitration context as it does in other arbitration contexts. We therefore see no reason not to put stock in *Colfax's* statement that the *Prima Paint* principle applies here.[8]

Finally, *Colfax's* rule that parties whose contract contains a valid arbitration provision must arbitrate any disputes arising under the contract is supported by the well-established policy favoring arbitration of labor disputes. The Supreme Court has long supported the use of arbitration rather than adjudication to resolve labor disputes, such that "[w]hen [a] collective bargaining agreement contains an arbitration clause ... there is a presumption of arbitrability that may only be overcome by 'forceful evidence' of an intent to exclude the [particular] claim [from arbitration]." *Oil, Chemical and Atomic Workers International Union, Local 7-1 v. Amoco Oil Co.,* 883 F.2d 581, 587 (7th Cir.1989) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960)). *Colfax's* extension of *Prima Paint* is in accord with this long-standing national policy because it has the effect of increasing the number of disputes settled by arbitrators rather than courts.

■ The fact that *Johnson* did not apply the severability rule but only asked whether the contract before it was patently ambiguous does not persuade us to reject the severability rule. When one considers that the *Johnson* court made no effort to explain its apparent departure from *Colfax's dictum* and in fact cited *Colfax* for a proposition that was the exact opposite of what *Colfax* actually said,[9] it is clear that the court did not pause to analyze the issue. Therefore, *Johnson* offers us no convincing reason to depart from *Colfax.*[10]

**8.** *Prima Paint's* holding was based on the fact that the Arbitration Act requires federal courts to order arbitration whenever they are "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. Because courts are only empowered to review the arbitration clause, they must defer to the arbitrator with respect to all other aspects of the contract. The reviewing court's role when considering the enforcement of a collective bargaining agreement is similar: "the judicial inquiry under § 301 [of the LMRA] must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or agreed to give the arbitrator power to make the award he made." *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960). Thus it makes sense for

courts to follow *Prima Paint's* severability rule in § 301 cases just as they do in Arbitration Act cases, deferring to the arbitrator on all provisions except the arbitration clause. This point further supports our conclusion that *Prima Paint* should control this case.

**9.** As noted *supra, Johnson's* assertion that a latent ambiguity renders a provision "outside the arbitrator's interpretive authority," 39 F.3d at 825, directly contradicts *Colfax's* view that a latent ambiguity does not strip the arbitrator of his authority because it is a question of interpretation, not of formation.

**10.** We should point out that we do not read the *Colfax* rule so broadly as to encompass situations in which one party argues that no contract existed at all. *Prima Paint* and its progeny are prem-

In sum, we conclude that arbitration clauses in collective bargaining agreements are severable; that is, that where a valid arbitration clause exists any disputes concerning the remainder of the parties' agreement should be submitted to the arbitrator, even if one party asserts that the contract should be rescinded. Because the contract between Castle and USWA had a valid arbitration clause, the dispute between them over the 401(k) Plan must be heard by an arbitrator.[11]

## II. *Count II: Violation of NLRA Section 302*

Count II of Castle's complaint alleges that its contract with USWA violates § 302 of the LMRA. That section was designed "to prevent employers from bribing union officers and union officers from extorting money from employers," while at the same time permitting employer-employee agreements for pension plans and other benefits. *Tyson v. International Brotherhood of Teamsters, Local 710 Pension Fund,* 811 F.2d 1145, 1149 (7th Cir.1987); *see also Toth v. USX Corp.,* 883 F.2d 1297, 1300–01 (7th Cir.), *cert. denied,* 493 U.S. 994, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989); *Roark v. Boyle,* 439 F.2d 497, 505 (D.C.Cir.1970). Thus § 302 prohibits employers or their agents from paying or loaning any "thing of value" to (*inter alia*) labor organizations that represent or seek to represent its employees unless the payments or loans fall within carefully delineated exceptions. 29 U.S.C. § 186. One of these exceptions permits employers to contribute funds to pension and other benefit plans if the payments are held in trust for the employees. 29 U.S.C. § 186(c)(5). Castle claims that the 401(k) Plan violates § 302 because (a) CIGNA is an agent of USWA; (b) the Plan requires Castle to contribute funds to CIGNA; and (c) the Plan is not set up as a trust.

USWA does not respond to count II on the merits, but instead argues that the § 302 issue is not ripe for disposition because until an arbitrator concludes that the parties have agreed to USWA's 401(k) plan, Castle will make no payments prohibited by § 302.

We agree with USWA. "The basic rationale of the ripeness doctrine is to prevent courts from entangling themselves in abstract disagreements and to protect government from 'judicial interference until a . . . decision has been formulated and its effects felt in a concrete way by the challenging parties.'" *Oriental Health Spa v. City of Fort Wayne,* 864 F.2d 486, 489 (7th Cir.1988) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). As explained above, determining the meaning of the 401(k) Plan provision—including whether the provision contains a latent ambiguity and should be rescinded—is a task for the arbitrator, not the court. Until she completes that task we do not know what the contract means, so we cannot declare it void under § 302. Even Castle admits that count II "is an alternative pleading that presumes an agreement to adopt *the Steelworkers 401(k) plan in the configuration put forth by the Steelworkers.*" Castle Resp. at 11 (emphasis added). The arbitrator could easily find that the parties

---

ised on the existence of an arbitration clause *"contained within a contract signed by the parties,"* so if a party is raising a true defense to contract formation—*e.g.,* that it never signed the contract at all—the *Prima Paint* severability rule would not apply and the defense would be heard by a court, not by an arbitrator. *Wheat, First Securities,* 993 F.2d at 819. Castle does not really argue that no contract existed; it argues that the contract should be rescinded because it contains a latent ambiguity. A claim of latent ambiguity, like a claim of fraud in the inducement, is a basis for rescinding a contract, not a challenge to contract formation. Therefore it falls under the *Prima Paint* logic.

**11.** Note that our decision on severability necessarily commits us to follow *Colfax's dictum* on

another issue: whether a latent ambiguity should be handled by the court or by an arbitrator. (As noted *supra* at note 7, *Colfax* and *Johnson's* true holdings did not resolve this issue; the cases merely disputed the point in *dicta.*) For us to say that it does not matter whether the ambiguity in the Castle–USWA contract is latent or patent, we must believe that latent ambiguities, like patent ambiguities, raise interpretive questions rather than formation questions. That is because under *Prima Paint,* formation questions are for the court. *See supra* note 10. Therefore we adopt the *Colfax* majority's view (which we called its second rule) that latent ambiguities fall inside the arbitrator's authority.

agreed to something else, in which case Castle's § 302 argument would disappear. Because "[t]his [c]ourt cannot entertain a claim which is based upon ' "contingent future events that may or may not occur as anticipated, or indeed may not occur at all," ' " we refuse to consider count II here. *Oriental Health Spa,* 864 F.2d at 489 (quoting *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985) (in turn, quoting 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3532 (2d ed. 1984))).

### III. Counts III and IV: Fraud and Negligent Misrepresentation

■ Count III of Castle's complaint alleges that USWA fraudulently induced it to agree to the 401(k) Plan by representing that the Plan would require Castle only to make payroll deductions, when in fact the company would be saddled with considerable responsibility. Count IV mirrors count III, except that it states a claim for negligent misrepresentation rather than fraud. USWA argues that under *Colfax* the allegations in counts III and IV must be submitted to arbitration. Castle responds only that its claims for fraud and negligent misrepresentation are pendent state claims arising out of the same operative facts as its federal claims and therefore are within the supplemental jurisdiction of the court.

Castle's position is unresponsive because USWA is not arguing that the court lacked jurisdiction under 28 U.S.C. § 1367.[12] Setting this point aside, however, we still rule in USWA's favor. Drawing on *Prima Paint,* *Colfax* stated that "a contract dispute is arbitrable even if one party argues that the contract should be rescinded because it does

not express an actual agreement of the parties, for example because it was induced by fraud." 20 F.3d at 755. *Colfax* explicitly mentioned fraudulent inducement, but its rule necessarily applies to negligent misrepresentation claims as well, since negligent misrepresentation is merely a weaker relative of fraud. Therefore, counts III and IV must be submitted to the arbitrator.

### IV. Count V: Breach of Contract

Count V of Castle's complaint alleges that USWA breached the parties' agreement concerning the 401(k) Plan by refusing to allow Castle to customize the Plan for its employees and refusing to honor the agreement's covenant that employees could make participation decisions only once a year. USWA argues that even if Castle's allegations are true (which USWA denies), the breach of contract claim must be arbitrated. Castle responds that because the collective bargaining agreement does not provide for grievances initiated by the company, the parties did not agree to submit such grievances to arbitration, so Castle is not required to arbitrate its claim.

■ There is some merit to Castle's position. While doubts about whether to arbitrate a dispute under a collective bargaining agreement should be resolved in favor of arbitration, *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1352–53, "it remains the rule that parties are bound to arbitrate only those disputes which, under a fair construction of their collective bargaining agreement, they have bound themselves to arbitrate." *Faultless Division v. Local Lodge No. 2040 of District 153 International Association of Machinists and Aerospace Workers,* 513 F.2d 987, 990 (7th Cir.1975). In other words,

12. USWA maintains that even if it had taken such a position, it would have been correct because state law contract claims, including fraud and negligent misrepresentation, are preempted by the federal common law that has emerged under § 301. Thus if the court had jurisdiction, it would be under § 301 of the LMRA.

Precedent suggests that USWA may be correct. The Supreme Court has said that "[i]f the policies that animate § 301 are to be given their proper range, ... the pre-emptive effect of § 301 must extend beyond suits alleging contract viola-

tions.... Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 210–11, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). Nonetheless, we need not decide whether the claims asserted by Castle in Counts III and IV fall within the sphere defined by *Lueck.*

USWA cannot force Castle to arbitrate unless the collective bargaining agreement mandates such a resolution.

■ Castle raises what the Third Circuit has called a "recurring issue" in collective bargaining cases: "whether the *company* is required to bring its claims to an arbitrator when the collective bargaining agreement establishes procedures which limit the initiation of arbitration solely to the union." *Lehigh Portland Cement Co. v. Cement, Lime, Gypsum, and Allied Workers Division, International Brotherhood of Boilermakers, Blacksmiths, Iron Ship Builders, Forgers and Helpers*, 849 F.2d 820, 822 (3d Cir.1988). In such cases, courts hold that "where some ambiguous language appears in the contract and the contract can be read to provide for the employer initiating arbitration, ... the strong presumption in favor of arbitration requires that the employer *must* arbitrate his grievance." *Id.* On the other hand, "when a contract contains no language [that] explicitly contemplates or permits the employer to initiate arbitration procedures, and the grievance structure is designed solely to afford the union the right to arbitrate, ... an employer ... is not bound to assert its claims before an arbitrator." *Id.; see also Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241–44, 82 S.Ct. 1318, 1320–22, 8 L.Ed.2d 462 (1962); *Faultless*, 513 F.2d at 989–94.

This rule is fairly straightforward, but *Lehigh* sends mixed signals about how to apply it. Although the *Lehigh* court was confronted with facts very similar to those of *Eberle Tanning Co. v. Section 63L, FLM Joint Board, Allegheny Division, United Food and Commercial Workers International Union*, 682 F.2d 430 (3d Cir.1982), and relied on *Eberle* for its statement of the controlling law, it reached the opposite conclusion without distinguishing *Eberle* or explaining the departure.[13]

The grievance procedures in the Castle–USWA agreement closely resemble those at issue in *Lehigh*,[14] which suggests that we should follow the Third Circuit's lead. But should we do as *Lehigh* said or do as it did? Fortunately, we can resolve this case without deciding whether *Eberle* or *Lehigh* contains the better result. Even if we followed *Lehigh*, as Castle urges, we would still rule in USWA's favor because the cases make an exception when the issues raised by the company have already been raised by the union in a grievance and are pending before an arbitrator (or soon will be). The exception makes sense because if the issues the company seeks to resolve in court will be arbitrated anyway, there is little reason for the court to address them—especially when the arbitrator's decision may well be binding upon the court. Thus both the Supreme Court and the Seventh Circuit have suggested that in such cases, the court can either dismiss the claim entirely or stay litigation pending resolution by the arbitrator. *Atkinson*, 370 U.S. at 243–45, 82 S.Ct. at 1321–23; *Faultless*, 513 F.2d at 994; *see also Summer Rain v. The Donning Company/Publishers, Inc.*, 964 F.2d 1455, 1461 (4th Cir.1992) (where arbitrator's decision on arbitrable issues could render district court's ruling on non-arbitrable issues unnecessary, "litigation on the non-arbitrable issues should be stayed pending arbitration"); *Transcaribbean Motors Transport, Inc. v. Union de Tronquistas de P.R., Local 901*, 553 F.Supp. 362, 364 (D.P.R.

---

13. In *Eberle*, "the first steps of the [agreement's] grievance procedures ... were designed to be employee initiated, [but] later steps of the process called for *both* [the company] and the union to meet monthly to resolve grievances," and if the grievance remained unsettled, either party could refer it to an arbitration panel. *Lehigh*, 849 F.2d at 822. The *Eberle* court held that this agreement was ambiguous concerning the company's duty to arbitrate and, in accordance with federal labor policy, resolved the ambiguity in favor of arbitration. *Id.* The grievance procedures of the agreement at issue in *Lehigh* contained several steps, the first four of which required "that the grievance be prosecuted by an employee." *Id.* at 825. Although the procedures arguably permitted the company to request arbitration at the fifth step, only disputes that had not been resolved in the first four steps could be arbitrated, so "the entire grievance-arbitration procedure starts and ends only with employees. By doing so, it precludes the arbitration of any claim asserted by [the company]." *Id.*

14. The first three steps in the grievance procedure are open only to employee complaints. In step four, the company arguably can appeal the result of step three to an arbitrator, but it cannot initiate any grievances of its own at that stage.

1982) (where "the issues presented to the arbitrator could obviate the need for future litigation," court action must in some cases be dismissed without prejudice).

 Count V falls within the scope of the exception. USWA has already filed a grievance with Castle concerning the parties' obligations under the 401(k) Plan provision in the collective bargaining agreement—the very issue Castle raises in count V—and that grievance will be arbitrated. Thus count V also must be submitted to arbitration. We dismiss it, granting Castle leave to refile if for some reason arbitration does not cover the issues it presents.

### V. Sanctions

 We turn, finally, to USWA's motions for sanctions under Rule 11 and § 301 of the LMRA. Rule 11 permits sanctions against parties or their attorneys "when they sign a pleading, motion, or other paper that, after reasonable inquiry, is not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law" or when they "bring legal action for any improper purpose, such as to harass or needlessly increase the cost of litigation." *National Wrecking Co. v. International Brotherhood of Teamsters, Local 731,* 990 F.2d 957, 963 (7th Cir.1993). Similarly, sanctions may be awarded under § 301 to a party whose opponent's suit is meritless or frivolous, that is, "brought in bad faith to harass rather than to win." *Chrysler Motors Corp. v. International Union, Allied Industrial Workers of America,* 959 F.2d 685, 689 (7th Cir.), *cert. denied sub nom. Chrysler Corp. v. International Union, Allied Industrial Workers,* — U.S. —, 113 S.Ct. 304, 121 L.Ed.2d 227 (1992).[15] In light of the very difficult legal question presented by this case, we can find no basis for describing Castle's position as frivolous or asserted in bad faith, nor can we find any evidence that the company intended to harass USWA. We therefore find sanctions wholly inappropriate.

### CONCLUSION

USWA's motion for summary judgment is granted. Its motions for sanctions are denied.

---

15. Although § 301 does not expressly authorize attorney's fees, courts have held that a prevailing party is entitled to such fees if the conditions described in the text are met. *Chrysler Motors,* 959 F.2d at 689; *Local 879, Allied Industrial Workers v. Chrysler Marine Corp.,* 819 F.2d 786, 791 (7th Cir.1987). Note that a showing of bad faith is required for sanctions under § 301. Because Rule 11 is an objective test, it requires no such showing. *See Chrysler Marine,* 819 F.2d at 791.