**IRON WORKERS' LOCAL NO. 25 PENSION FUND, Iron Workers' Local No. 25 Individual Account Retirement Fund, Iron Workers' Health Fund of Eastern Michigan, Iron Workers' Local No. 25 Vacation Pay Fund, and Iron Workers' Apprenticeship Fund of Eastern Michigan, Plaintiffs,**

v.

**ALLIED FENCE AND SECURITY SYSTEMS, INC., Defendant.**

No. 95–71531.

United States District Court,
E.D. Michigan,
Southern Division.

April 22, 1996.

Michael J. Asher, Southfield, Michigan, for plaintiffs.

Lauren J. Hammett, Detroit, Michigan and Mark J. Eby, Ann Arbor, Michigan, for defendant.

### OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

Plaintiffs, various trust funds established under § 306 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, commenced this action on April 12, 1995, alleging that Defendant Allied Fence and Security Systems ("Defendant") failed to make fringe benefit contributions to the Plaintiff funds pursuant to a valid collective bargaining agreement between Defendant and Local No. 25 of the International Association of Bridge, Structural and Ornamental Iron Workers ("Local 25"). In response, Defendant denies the existence of a collective bargaining agreement with Local 25, and contends that its signature on any such purported agreement was fraudulently obtained through misrepresentations by Local 25.

Plaintiffs have moved for summary judgment, arguing that Defendant's claim of fraud is insufficient, as a matter of law, to excuse its failure to make contributions to the Plaintiff funds. Counsel for the parties addressed this motion at a conference in this Court's chambers on April 11, 1996. Having considered the arguments made by counsel at that conference, and having reviewed the materials submitted by the parties, the Court is now prepared to rule on Plaintiffs' motion.

For the reasons stated below, the Court finds that Plaintiffs are entitled to summary judgment on the issue of Defendant's liability for its admitted failure to make contributions to the Plaintiff funds.

## I. *FACTUAL BACKGROUND*

The facts of this case are quite straightforward and, for purposes of Plaintiffs' motion, are largely undisputed. Defendant Allied Fence and Security Systems is a small business engaged in the installation of fences and security systems, primarily at private residences. Defendant employs fewer than ten persons, none of whom are union members. According to an affidavit submitted by Larry Davidson ("Davidson"), Defendant's majority shareholder and president, Defendant "does not perform 'union' jobs."

In 1992, Defendant learned of a possible job at a water treatment plant in Adrian, Michigan. Defendant was advised that this was a union job, but nonetheless believed that it could bid on the job by securing a temporary permit from the local union. Defendant understood that such a temporary permit would enable Defendant to perform a "union" job, provided that Defendant paid the prevailing union wage and made appropriate contributions to employee benefit plans for that specific job only.

Based upon this understanding, Defendant sought a temporary permit from Local 25. George Woods ("Woods"), the Local's business agent, advised Davidson in a telephone conversation that he would send out the necessary paperwork for Davidson's signature. At his deposition, Davidson testified that, upon receiving a document from Woods in the mail, he "thumbed through it" without reading its provisions, signed the back page, and returned it to Woods. (Davidson Dep. at 8–9.) This document turned out to be a

collective bargaining agreement ("CBA") between Local 25 and various contractors that install fences.[1]

During their telephone conversation, Woods also advised Davidson that the Adrian job being sought by Defendant was within the territory controlled by Local 55 of the Iron Workers union. Accordingly, Davidson contacted Local 55, and, at Woods' direction, asked that Local 55 send a union member to the job site. This union member, along with two of Defendant's employees, performed the Adrian job over a six-day period in June, 1992.

Defendant states that it paid union wages and made appropriate fringe benefit contributions to various Local 55 trust funds while performing the Adrian job. Defendant further states that it never again performed any jobs within the territory governed by Local 55, and that it generally has performed no "union" jobs whatsoever since 1992.

Nearly three years after the Adrian job was completed, Defendant received a letter from the Plaintiff funds, demanding access to Defendant's payroll records so that the amount of Defendant's allegedly delinquent contributions could be determined. Defendant contends that, prior to its receipt of this letter, it was completely unaware that the agreement Davidson had signed was a CBA rather than a temporary permit.

When Defendant refused to grant the Plaintiff funds access to its payroll records, Plaintiffs commenced the instant action. Plaintiffs contend that Defendant, through its agent Davidson, executed a valid and binding CBA, pursuant to which Defendant agreed to make monthly fringe benefit contributions to the Plaintiff funds for each of Defendant's employees who is covered by the CBA.[2] Defendant responds that its signa-

---

1. In their initial brief in support of their motion for summary judgment, Plaintiffs characterized the document signed by Davidson as a "short form" or "compliance" agreement. However, in their reply brief, Plaintiffs claim that Davidson actually received and executed a full twenty-six page CBA, complete with a title page captioned "1989–1992 Iron Workers Agreement."

2. The record before this Court does not disclose the extent of Defendant's alleged delinquency in

making contributions. The CBA page signed by Davidson is dated April 13, 1992, but, by its terms, the CBA requires employers to make fringe benefit contributions for "all work performed on or after June 1, 1989." The CBA further provides that it expires on May 31, 1992, but that it "will remain in full force and effect" if Local 25 and the fence contractors have not executed a new agreement before that date. Plaintiffs have not indicated whether a new

ture on the CBA was procured through the fraudulent misrepresentations of Local 25, and that the CBA therefore imposes no enforceable obligations upon Defendant.

## II. ANALYSIS

### A. The Standards Governing Consideration of a Motion for Summary Judgment

The Federal Rule governing the Court's treatment of Plaintiffs' motion provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ Three 1986 Supreme Court decisions—*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[★] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[★] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[★] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
*   *   *

[★] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[★] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[★] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply these principles in evaluating Plaintiffs' motion for summary judgment.

agreement exists, or whether the old CBA continues to govern the relationship between Local 25 and the fence contractors. However, in their complaint, Plaintiffs ask that the Court order an audit of Defendant's books and records for the period from January, 1989 through the present.

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (Supp.1994).

**B.** *Defendant's Ample Opportunity to Read the Collective Bargaining Agreement Before Signing It Defeats Its Attempt to Invoke a "Fraud in the Execution" Defense in This Case.*

Plaintiffs offer a simple argument in support of their motion for summary judgment. They point to the uncontested fact that Larry Davidson, Defendant's president, signed a collective bargaining agreement, and argue that Defendant thereby incurred an obligation to make contributions to the Plaintiff funds on behalf of any employees covered by the CBA. Because Defendant admittedly has failed to make the contributions called for under the CBA, Plaintiffs assert that they are entitled to summary judgment on the issue of Defendant's liability for delinquent contributions.

Defendant's response to this claim is equally straightforward. Defendant contends that Larry Davidson had no idea that he was signing a collective bargaining agreement. Rather, due to the misrepresentations made by an official of Local 25, Davidson believed that he was signing a temporary permit that merely provided the terms under which Defendant would perform one specific job in Adrian. Accordingly, because Davidson lacked any knowledge of the nature of the document he was signing, Defendant argues that the CBA is void, and therefore creates no enforceable obligations.

The parties agree entirely about the statutory and case law that controls the instant matter. First, Plaintiffs have invoked § 515 of ERISA as the source of Defendant's alleged duty to make contributions to the Plaintiff funds. That section provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. In turn, § 502 of ERISA authorizes the Plaintiff funds to bring a civil action alleging a violation of § 515, and also specifies the remedies available to Plaintiffs should they prevail. *See* 29 U.S.C. § 1132.

Congress enacted § 515 of ERISA in 1980 to address a perceived problem in ERISA enforcement. As explained by the Seventh Circuit in *Central States, Southeast & Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1152 (7th Cir. 1989), Congress was concerned that ERISA plans were incurring high litigation costs and were often failing to collect delinquent contributions due to the assertion of various contract formation defenses by employers. In particular, Congress found that employers were escaping their obligations to contribute to ERISA funds by pointing to various defects in the process of negotiating collective bargaining agreements with unions. For example, an employer might argue that a CBA had no legal effect, and that the employer therefore was relieved of any obligation to make fringe benefit contributions, because the union had subsequently failed to gain the support of a majority of employees. 870 F.2d at 1152–53 (discussing cases holding that a union's failure to achieve majority status relieved an employer's obligation to make ERISA contributions). In this way, problems in labor-management relations were having an adverse effect on the financial health of ERISA plans. 870 F.2d at 1153.

■ Congress enacted § 515 in an effort to shield ERISA plans from such labor-management disputes. In particular, by providing that an employer's obligation to make contributions to an ERISA plan is enforceable "to the extent not inconsistent with law," § 515 precludes employers from appealing to defects in a CBA's formation—"such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law"—as justification for failing to make the ERISA contributions called for in the CBA. 870 F.2d at 1153. Simply put, following the enactment of § 515, "nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement." 870 F.2d at 1153.

■ In light of this congressional purpose, courts have uniformly construed § 515 as

sharply limiting the defenses available to employers in actions seeking payment of delinquent ERISA trust fund contributions. *See, e.g., Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769, 773 (9th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987). As a third-party beneficiary to an agreement between an employer and its employees, an ERISA fund generally would be "subject to any contract defense which the promisor could assert against the promisee if the promisee were suing on the contract." *Rozay's Transfer,* 791 F.2d at 773. However, in light of § 515 and the public interest in protecting workers who are dependent upon the financial health of ERISA funds, courts have recognized only three defenses that employers may invoke to defeat an apparent obligation to make ERISA contributions:

> (1) the pension contributions themselves are illegal; (2) the collective bargaining agreement is void *ab initio,* as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement; and (3) the employees have voted to decertify the union as [their] bargaining representative, thus prospectively voiding the union's collective bargaining agreement.

*Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3d Cir.1992) (citations omitted).

The parties agree that only the "fraud in the execution" defense potentially applies in the instant matter. Further, they agree that a trilogy of Ninth Circuit cases best illustrates the nature of this defense. First, in *Southern Cal. Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund,* 728 F.2d 1262 (9th Cir.1984), the Ninth Circuit held that an employer could not evade his obligation to contribute to an ERISA fund by pointing to false assurances made by a union official at the time he signed a CBA. According to the employer, the union official had secured his signature on the CBA by promising that he would be eligible for a pension under the agreement, and by assuring him that he would not be required to make contributions on behalf of his part-time employees. 728 F.2d at 1263–64. The court held that this "fraudulent inducement"

defense was unavailable in a suit for delinquent ERISA contributions. 728 F.2d at 1265–66.

Next, in *Operating Eng'rs Pension Trust v. Gilliam,* 737 F.2d 1501 (9th Cir.1984), the Ninth Circuit concluded that an employer had asserted a successful defense to an action for delinquent contributions. In *Gilliam,* the employer visited a union's district office for the limited purpose of joining the union as an owner-operator in order to perform one particular job. 737 F.2d at 1503. In response, a union official produced various documents for the employer's signature; the employer did not read the documents, but instead simply signed them at the places indicated by the union official. 737 F.2d at 1503. The employer later discovered that he had signed a so-called "short-form bargaining agreement" and a "written acknowledgement of trust agreements incorporated by the short-form agreement." 737 F.2d at 1503. The union official did not inform the employer that he had signed a collective bargaining agreement or that the documents covered any employee or operation other than the specific job that the employer wished to perform; nor did the union official provide the employer with "copies of the short-form agreement or the union's master labor agreement." 737 F.2d at 1503.

In light of these facts, the court held that the employer had asserted a successful defense to an action seeking payment of delinquent ERISA contributions. 737 F.2d at 1504. The court found that, "[u]nder the circumstances, [the employer] reasonably and justifiably thought the documents involved only an application for union membership and his signing of the short-term agreement did not create a binding collective bargaining agreement." 737 F.2d at 1505. Moreover, because the employer had never operated as a union business nor employed any union members, and because none of his employees had ever sought benefits from the plaintiff ERISA funds, the court reasoned that "in this case no potential trust beneficiary can be injured or misled by the employer's claim that he never intended to enter a collective bargaining agreement." 737 F.2d at 1503–05.

Finally, in *Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769 (9th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987), the Ninth Circuit reconciled the opposing results in *Bjorklund* and *Gilliam.* The court explained:

The distinction between the types of misrepresentation presented in *Bjorklund* on the one hand and *Gilliam* on the other is the distinction between "fraud in the inducement" and "fraud in the execution" (or "fraud in factum"). The former induces a party to assent to something he otherwise would not have; the latter induces a party to believe the nature of his act is something entirely different than it actually is. *See* 12 *Williston on Contracts* § 1488, at 332 (3d ed. 1970). "Fraud in the execution" arises when a party executes an agreement "with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms." Uniform Commercial Code § 3-305(2)(c); *see* Restatement (Second) of Contracts § 163 (1981).

791 F.2d at 774.

Turning to the case before it, the court held that the employer had interposed a "fraud in the inducement" defense, and therefore could not escape its obligation to make ERISA contributions. 791 F.2d at 774–75. The employer claimed that it had signed a CBA only after receiving assurances from union officials that the employer would be under no obligation to make retroactive contributions covering a period before the date the CBA was executed. 791 F.2d at 771–72. However, the ERISA fund subsequently denied that any binding promises were made regarding retroactive contributions, and brought suit to recover those contributions. 791 F.2d at 772. The court found that the false assurances allegedly made by union officials could not give rise to a "fraud in the execution" defense:

To maintain a defense of fraud in the execution, [the employer] would have to establish "excusable ignorance of the contents of the writing signed." *See* Uniform Commercial Code § 3–305 comment 7. But there simply was no confusion as to the actual contents of the agreement. In-

stead the misrepresentations concerned whether the express provisions of the agreement would in fact be enforced—an example of fraud in the inducement.

791 F.2d at 774–75.

Judge Taylor of this District applied this Ninth Circuit trilogy in determining that an employer had not established a "fraud in the execution" defense in an action for delinquent ERISA contributions. *Bricklayers' Pension Trust Fund v. Chirco,* 675 F.Supp. 1083 (E.D.Mich.1987). In *Chirco,* as in the matter before this Court, the employer claimed that a union official had "falsely represented ... that. he must simply join the union in order to perform" a specific job, and that the employer's signature on a CBA would serve this limited purpose. 675 F.Supp. at 1084. The union official left the CBA at the job site for the employer's signature, and collected the signed agreement approximately two weeks later. 675 F.Supp. at 1084.

Prior to trial, the *Chirco* court denied the plaintiff funds' motion for summary judgment on the issue of liability, finding that a genuine issue remained "whether [the employer] was told to sign the collective bargaining agreement in order to join the union, and thereby [was] victimized by the Union agent." 675 F.Supp. at 1084. However, after a bench trial, the court concluded that the employer's showing in support of his "fraud in the execution" defense was deficient in several respects. 675 F.Supp. at 1085–88. First, the court found the union official's testimony more credible than the employer's, and concluded that there was "no misstatement or misrepresentation with respect to the type of document [the employer] was signing and the obligations that arose thereunder." 675 F.Supp. at 1086. Next, because the employer had previously entered into several collective bargaining agreements, and because the CBA he had signed in the instant matter was "an extensive 55-page document" that was "well known" to those in the employer's line of work, the court found that the employer "could not have been ignorant of the contents of this collective bargaining agreement." 675 F.Supp. at 1087. Finally, after noting that the union official had left

the document at the job site and retrieved it several days later, the court concluded that the employer clearly had a "reasonable opportunity to obtain knowledge of [the CBA's] character," notwithstanding his inability to read or write English. 675 F.Supp. at 1087.

Turning now to the instant matter, the Court first notes that the present record is silent on two of the factors relied upon by the *Chirco* court. First, there is no indication that Defendant had any prior familiarity with collective bargaining agreements of the sort at issue here. Neither have Plaintiffs offered any evidence to rebut Defendant's claim that the Local 25 official made a false representation by failing to divulge the true nature of the document that would be forthcoming in the mail.[4]

■ However, under the present record, the instant matter and *Chirco* do share one key feature: in both cases, the employer had an opportunity, outside the presence of any union official, to review the document before signing it. Accordingly, the question becomes whether this single yet important fact in common should lead this Court to the same result reached in *Chirco*. Put another way, the disposition of this matter turns on a single inquiry: whether Defendant's ample opportunity to review the CBA before signing it defeats Defendant's attempt to rely on a "fraud in the execution" defense to Plaintiffs' claim. The Court holds that it does.

As an initial matter, the Court finds that no prior case has involved the precise—and rather stark—factual scenario presented in this matter. Both parties naturally seize upon this opportunity to selectively pick and choose among the cases that collectively state the relevant law. On one hand, Plaintiffs point out, and this Court's independent survey verifies, that no court has sustained the defense of "fraud in the execution" where the employer had a full opportunity to review a

document before signing it. Rather, courts have routinely held that the employer's ignorance of the nature of the document being signed must be "excusable," and must arise from the lack of an opportunity to obtain knowledge of the document. *See, e.g., Illinois Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d 1361, 1365–66 (7th Cir.1995) (stating that an employer's ignorance must be "excusable"); *Connors v. Fawn Mining Corp.,* 30 F.3d 483, 492–93 (3d Cir.1994) (noting the employer's claim that "the union surreptitiously substitute[d] a materially different contract," and concluding that the employer's ignorance of the nature of the contract was therefore excusable); *Rozay's Transfer,* 791 F.2d at 774; *Gould v. Mobile Concrete Pumping, Inc.,* 865 F.Supp. 619, 623–24 (W.D.Mo.1994) (finding excusable ignorance where the union failed to provide the employer with a copy of the document stating the obligation to make contributions); *Chirco,* 675 F.Supp. at 1086–87. In this case, because Local 25 mailed the CBA to Defendant, and because there is no evidence whatsoever of any pressure exerted upon Defendant to quickly execute the document without taking the time to read it, it is clear that Defendant had ample opportunity to review the CBA before signing it.

On the other hand, although courts have uniformly insisted that an employer's ignorance must be excusable, it is equally true that, so far as this Court is aware, no court has rejected an employer's "fraud in the execution" defense *solely* on the ground that the employer had an opportunity to review a document before signing it. Rather, in every case rejecting such a defense, the court has cited additional evidence suggesting that the employer was aware of the nature of the document being signed. *See, e.g., Illinois Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking,* 71 F.3d

---

4. On the other hand, the Court notes that Defendant has offered scant evidence of anything resembling an affirmative "misrepresentation" by a union official. In an affidavit submitted in opposition to Plaintiffs' motion, Davidson states that he told George Woods, a business agent for Local 25, that he needed a temporary permit in order to bid on the Adrian job. In response, Woods advised Davidson that he would "send the necessary paperwork." This evidence plainly does not show that an official of Local 25 actively misrepresented the nature of the document being sent to Defendant. At most, it suggests that Woods failed to correct Davidson's mistaken impression about the sort of documents Davidson would have to sign in order to perform the Adrian job.

1361, 1366 (7th Cir.1995) (noting that the employer admitted that it was bound by the provisions of the plaintiff fund's trust agreement, and that the employer had previously made contributions pursuant to that agreement); *Rozay's Transfer,* 791 F.2d at 774 (pointing out that the employer did not claim ignorance of the fact that he was signing a CBA); *Chirco,* 675 F.Supp. at 1087 (relying in part on the fact that the employer had previously executed CBAs). Here, apart from pointing to the sheer length of the agreement and the caption appearing on its front page, Plaintiffs have offered no evidence suggesting that Defendant must have known that Local 25 had sent a CBA rather than some more limited agreement. In particular, Plaintiffs have offered no evidence to rebut the assertion in Davidson's affidavit that he relied on the representations of others in concluding that he was signing a temporary permit.[5]

◼ In short, no prior case has involved the stark facts presented in this case: there is no evidence to rebut Davidson's claimed lack of awareness that the document he signed was a CBA, but neither is there evidence suggesting an excuse for Davidson's failure to avail himself of the opportunity to review the document before signing it. While there may be no prior cases decided on these facts, the Court nonetheless finds that the rule that emerges from the case law is quite clear. In order to establish a "fraud in the execution" defense, it is not enough that Defendant was ignorant of the nature and contents of the document being signed; in addition, that ignorance must be *excusable. See Rozay's Transfer,* 791 F.2d at 774 (quoting U.C.C. § 3–305 cmt. 7). Or, as the Restatement phrases it, fraud in the execution arises only where a party "neither knows *nor has reasonable opportunity to know* of the character or essential terms of the proposed contract." Restatement (Second) of Contracts § 163 (1981) (emphasis added); *see also Resolution Trust Corp. v. Wilson,* 851

F.Supp. 141, 146 n. 5 (D.N.J.1994) (citing the Restatement, and also noting that a party's negligent failure to avail himself of a reasonable opportunity to review a contract before signing it precludes that party from successfully asserting a "fraud in the execution" defense).

In this case, Defendant has satisfied only half of this test, while altogether failing to address the other half. Davidson's affidavit attests to his ignorance of the nature or contents of the document he signed, and Plaintiffs offer nothing to rebut this evidence. However, neither Davidson's affidavit nor any other evidence in the present record demonstrates, or even implies, that this ignorance was excusable in light of Davidson's ample and uncoerced opportunity to review the document he received from Local 25.[6]

In effect, Defendant asks this Court to hold that the "excusable ignorance" standard is satisfied, at least for purposes of surviving Plaintiffs' motion for summary judgment, solely by virtue of the alleged misrepresentations made by an official of Local 25 in his telephone conversation with Davidson. The Court declines to so hold. First, the sort of "passive" fraud Defendant has charged against the Local 25 representative could not have so overborne Davidson's will as to have negated his subsequent opportunity to review the agreement before signing it. *Compare Connors,* 30 F.3d at 493 (finding fraud in the execution where "the union allegedly substituted the body of the contract document after the execution of the signature page"); *Gilliam,* 737 F.2d at 1503–05 (finding fraud in the execution where the employer went to the union's district office and signed various forms at the places indicated by a union official, but where the union did not provide the employer with a copy of the union's master labor agreement).

◼ Next, to the extent that Defendant contends that Davidson signed the agreement only because the Local 25 official had

---

5. However, as noted earlier, Defendant's claim of fraud is undermined by Davidson's failure to attribute specific and affirmative misrepresentations to specific individuals.

6. Nor may the Court speculate that Defendant might be able to put forth evidence at trial that might explain Davidson's failure to review the document before signing it. Federal Rule of Civil Procedure 56(c) clearly precludes this Court from engaging in such speculation.

led him to believe that it would cover only the Adrian job, the Court finds that this claim really amounts to "fraud in the inducement" rather than "fraud in the execution." *Cf. Rozay's Transfer*, 791 F.2d at 771, 774 (finding fraudulent inducement where the employer understood that, despite the language of the document he signed, he would not be required to make retroactive contributions); *Bjorklund*, 728 F.2d at 1263, 1265–66 (finding fraudulent inducement where the employer was falsely assured that he would only be required to make contributions for his full-time employees). In essence, Defendant contends that the Local offered assurances that, whatever the document might say, the parties had actually entered into a more limited agreement. To accept this argument would permit Defendant to bootstrap the elements of "fraud in the inducement" into a "fraud in the execution" claim, for it would allow Defendant to prevail merely by citing the Local's allegedly misleading statements as the *sole* cause of Defendant's ignorance of the nature of the document. Not only does this argument disregard the requirement that Defendant be deprived of a meaningful opportunity to discover the true nature of the document, but it also would defeat the entire purpose behind the enactment of § 515 of ERISA. Thus, the Court rejects the contention that the misrepresentations allegedly made by a Local 25 official significantly undermined Defendant's ability to ascertain the true nature of the document subsequently provided by the Local.

▆▆▆ The Court recognizes the harshness of the result reached in this case. Under Defendant's unrebutted version of the circumstances surrounding its execution of the CBA, Defendant is potentially subject to liability for several years of delinquent contributions [7] solely because its president failed to read a document before signing it. Yet, the law in this area is clear: so long as Defendant had an opportunity to review the CBA before signing it, Defendant cannot es-

cape the obligation to make contributions pursuant to the CBA. Simply put, the failure of Defendant's president to read a 26–page document captioned "1989–1992 Iron Workers Agreement" does not constitute *excusable* ignorance. Moreover, the result in this case fully comports with the policy concerns that led Congress to enact § 515 of ERISA. That section was intended to shield employees from any labor-management disputes that do not substantially undermine the integrity of a duly-executed CBA. Defendant's belief that Local 25 would provide a "temporary" agreement, standing alone, cannot overcome the undisputed fact that Defendant's president signed a valid CBA after being afforded a full opportunity to examine it.

In sum, because Defendant has failed to identify a genuine issue of material fact with respect to its "fraud in the execution" defense, and because the Court finds that Defendant's claimed ignorance of the nature of the document it executed does not suffice to establish that defense, the Court concludes that Defendant cannot escape the obligation to make contributions to the Plaintiff trust funds in accordance with the terms of the CBA. Accordingly, Plaintiffs are entitled to summary judgment on the issue of Defendant's liability for its admitted failure to make such contributions.

### III. *CONCLUSION*

For the reasons stated above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment be GRANTED. The Court will conduct a hearing to determine the extent of Defendant's liability for failing to make contributions to the Plaintiff trust funds.

---

7. Determination of the exact extent of the liability Defendant incurred by signing the CBA must await an evidentiary hearing. In this regard, the Court notes that Plaintiffs' three-year delay in seeking delinquent contributions suggests that Plaintiffs may have been derelict in their fiducia-

ry duties toward any of Defendant's employees who might be covered by the Plaintiff funds. As a result, Plaintiffs may have forfeited their right to collect all or part of Defendant's delinquent contributions. *See Agathos v. Starlite Motel*, 977 F.2d 1500, 1506–08 (3d Cir.1992).