LOCAL UNION 1253, INTERNATION-
AL BROTHERHOOD OF ELECTRI-
CAL WORKERS, AFL–CIO, et al.,
Plaintiffs,

v.

S/L CONSTRUCTION, INC., Defendant.

No. 01–CV–66–B–S.

United States District Court,
D. Maine.

July 24, 2002.

Jeffrey Neil Young, McTeague, Higbee, MacAdam, Case, Watson & Cohen, Topsham, ME, for plaintiffs.

Sean M. Farris, Farris, Heselton, Ladd & Bobrowiecki, P.A., Gardiner, ME, for S/L Construction Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, District Judge.

A union local and associated benefits funds seek to enforce rulings of a joint labor-management committee, which found that an electrical contractor violated the union's collective bargaining agreement. Having conducted a bench trial February 25, 2002, the Court makes the following findings of fact and conclusions of law and ORDERS the Defendant to abide by the committee's awards.

## I. OVERVIEW

This dispute implicates the specialized areas of federal labor policy and federal arbitration law. A union local and an electrical contractor orally negotiated the employment of two union electricians, and then proceeded to execute a written "section 8(f)," or "prehire," agreement. When the union sought to enforce the written agreement, the company balked. It protested that it never knew of, understood, or agreed to the terms of the prehire agreement. It had assumed that the written document memorialized the oral agreement and, consequently, signed the document without reading it. The contractor's obligations under this agreement and the methods of resolving related disputes are at the core of the present lawsuit.

A prehire agreement is a specialized type of labor agreement that exists only in the construction industry. *See* 29 U.S.C. § 158(f); *NLRB v. Goodless Elec. Co.*, 285 F.3d 102, 104–05 (1st Cir.2002) (explaining prehire agreements). In the typical prehire agreement, the union agrees to provide a constant and ready supply of trained workers by giving the employer access to the union hiring hall. In return, the employer agrees to obtain workers *exclusively* from the hiring hall and to pay union wages and benefits to all employees doing work covered by the agreement. *John Deklewa & Sons*, 282 N.L.R.B. 1375, 1380, 1387, 1987 WL 90249 (1987). These agreements frequently contain a "union security clause," which requires that within a certain amount of time, all existing employees will become members of the union. *See Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 262–63, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983) (explaining union security clauses). In short, a prehire agreement can convert a construction-industry employer into a union shop within a short time after it takes effect.

The prehire agreement in this case also contained an arbitration clause. When the company refused to comply with the terms of the prehire agreement, the union brought its complaint to arbitration and prevailed before the arbitrator. The employer continued to resist, and the union filed this action to enforce the arbitration awards.

Federal labor policy strongly encourages arbitration as a way to settle labor disputes. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As a result, when a dispute about an agreement containing an arbitration clause comes before a court, the court must be careful not to infringe on issues—legal or factual—that the parties have agreed to leave to an arbitrator. *See generally Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49 (1st

Cir.2002) (distinguishing contract defenses that should be heard by a court from those that must be left to an arbitrator). With this legal background in mind, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

The employer in this dispute, Defendant S/L Construction, Inc., is an electrical contractor headquartered in Augusta, Maine, that performs work for paper mills, utilities and public projects. In the spring of 2000, the company was performing electrical work at a treatment plant in Livermore Falls, Maine ("the Livermore Falls project"). Sometime in late April or early May, owner Jerry Burton determined that the company had fallen behind on the project and would need extra electricians in order to finish on time.

Believing that the company might be able to obtain the extra electricians from the local union, Burton directed his assistant, Gail Mayo, to contact Plaintiff Local 1253, International Brotherhood of Electrical Workers ("Local 1253"). Local 1253 is a labor organization that represents workers who perform "inside electrical work," or work governed by the National Electrical Code. On May 3, 2000, Mayo telephoned Wayne Rancourt, the business manager of Local 1253, and asked whether the union would be willing to provide S/L Construction with additional electricians. Rancourt told her that Local 1253 was willing to work with S/L Construction but

that he would require Burton, as the company's owner, to sign the necessary paperwork.

Burton contacted Rancourt directly that afternoon, and the two men arranged to meet the following day to sign the necessary papers. Later on May 3, Rancourt stopped by Burton's Augusta office and dropped off at least one copy of a fifty-three-page document titled "International Brotherhood of Electrical Workers Local Union # 1253 Inside Agreement" ("Inside Agreement").

The Inside Agreement is a collective bargaining agreement between the Electrical Contractors Association of Greater Boston and Local 1253. Among other provisions, it obligates signatory employers to pay certain wages, make contributions to Local 1253's benefits funds, and obtain employees exclusively through the union hiring hall. It also outlines a three-step process for resolving "[a]ll grievances or questions in dispute" among parties to the agreement. (*See* Inside Agt. at § 1.06 (Joint Ex. 2).)[1] The first step is informal resolution between representatives of the parties.[2] If this is unsuccessful, the second step is "adjustment" by a Labor–Management Committee comprising three union representatives and three representatives of the employers association ("the Committee").[3] Finally, if necessary, the parties proceed to final and binding adjudication before the Council on Industrial Relations for the Electrical Contracting Industry.[4] The version of the Inside

---

1. The designation "Joint Ex. ----" refers to the joint exhibits submitted by the parties during the February 25, 2002, bench trial.

2. **Section 1.06.**

 All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48

hours, they shall refer the same to the Labor–Management Committee.

3. **Section 1.07.**

 All matters coming before the Labor–Management Committee shall be decided by a majority vote. . . .

4. **Section 1.08.**

 Should the Labor–Management Committee fail to agree or to adjust any matter, such

Agreement that Rancourt delivered on May 3, 2000, was effective July 1, 1997, to May 31, 2000. A successor agreement took effect June 1, 2000, and is due to expire May 31, 2003 ("Second Inside Agreement").[5]

Although Burton was out of the office when Rancourt delivered the Inside Agreement on May 3, he did have the opportunity to review it the following morning before the two men met and, in fact, already possessed at least one other copy of the document. Nonetheless, Burton failed to read the Inside Agreement or become familiar with its terms.

Rancourt and Burton met on May 4. They discussed S/L Construction's needs for the Livermore Falls project: two electricians for a period of three to four weeks. Rancourt indicated that Local 1253 was willing to provide the two electricians. The two men also discussed, in a general sense, some of S/L Construction's other projects and the company's current and projected personnel needs.

At some point during the meeting, Rancourt asked Burton to sign a one-page document titled "Letter of Assent—A" ("Letter of Assent"). The Letter of Assent provides that by signing, an employer "agrees to comply with, and be bound by, all the provisions contained in [the Inside Agreement] and subsequent approved labor agreements." (*See* Letter of Assent (Joint Ex. 1).) Rancourt had already signed the document on behalf of Local 1253, and there was a place for Burton to sign on behalf of S/L Construction.

Rancourt believed that the Letter of Assent created a prehire agreement be-

tween S/L Construction and Local 1253 and that, by signing, Burton would bind S/L Construction to all the terms of the Inside Agreement. Rancourt also believed that the Inside Agreement applied to all of S/L Construction's employees, not just the two electricians for the Livermore Falls project. He did not explain his understanding of either the Letter of Assent or the Inside Agreement to Burton. Nor, however, did he say anything during the meeting to indicate that the documents pertained only to the two Livermore Falls electricians.

Burton did not read the Letter of Assent or ask Rancourt any questions about it or the Inside Agreement. He claims he assumed the Letter of Assent was an agreement that he would pay union wages and benefits to the two borrowed electricians and simply signed it. Within a few days, Local 1253 referred the two promised electricians to Livermore Falls.

In the days following the May 4 meeting, some of S/L Construction's employees learned that Local 1253 expected them to become members of the union. They were upset and protested to Burton, telling him that they had no interest in joining the union. After receiving these protests, Burton sent Rancourt a letter dated May 15, 2000, informing him that "the men are not interested in becoming unionized." (*See* Letter dated May 15, 2000 (Joint Ex. 4).) The letter also purported to confirm that their existing agreement pertained to "[t]wo (2) men, rates plus benefit," but indicated that the company was finding the agreement too costly. (*See id.*) Burton suggested that if S/L Construction were

---

shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding on both parties hereto.

5. The Second Inside Agreement differs from the Inside Agreement in ways that, for the most part, are not relevant to this dispute. The Court quotes the Inside Agreement except where otherwise noted.

going to use Local 1253 electricians in the future, the two men would have to revise the terms of their arrangement. The letter concluded, "If this plan does not work with you, we will no longer need the use of your men.... We will honor the agreement that we already have for the 2 men for 4 weeks. If you feel you do not want to continue our business arrangement we will understand." (*See id.*)

Over the weeks that followed, Local 1253 continued to insist that all of S/L Construction's electrical workers were required to join the union, and S/L Construction refused to force its employees to do so. When they were unable to reconcile their divergent views of their agreement, Rancourt decided to proceed to the next stage that the Inside Agreement outlined for resolving disputes: submitting his grievance to the Labor–Management Committee for what he believed would be binding arbitration. On June 21, 2000, Rancourt wrote to the chairman of the Committee to request a meeting, complaining that S/L Construction "wishe[d] to terminate the agreement in violation of Section 1.02A." (*See* Letter dated June 21, 2000 (Joint Ex. 9).) Section 1.02(a) of the Inside Agreement detailed the procedures by which either party could properly terminate or withdraw from the agreement.

In response to this request, the Committee held a meeting on July 11, 2000. Although Burton claims he did not understand that the meeting was intended to be an arbitration proceeding, he attended and had an opportunity to present evidence. At the meeting, he and Rancourt agreed that S/L Construction had satisfied the Inside Agreement's wage and benefit provisions with respect to the two electricians on the Livermore Falls project.

Following the July 11 meeting, the chairman of the Committee sent Burton a letter indicating that the Committee had found S/L Construction in violation of the termination provision. The body of the letter, in its entirety, reads,

Please be advised that the Labor–Management Committee, having heard the grievance filed by Local Union 1253, IBEW against S/L Construction, Inc. on July 11, 2000 in accordance with Article I, Section 1.07 of the Inside Construction Agreement, has ruled that S/L Construction, Inc. is in violation of Section 1.02a of the Inside Construction Agreement.

Please furnish to Business Manager Wayne Rancourt the names, telephone numbers and work locations of all current electrical workers as soon as possible.

Thank you for your attention to this matter.

(*See* Letter dated July 18, 2000 (Joint Ex. 13).)

After receiving the letter, Burton started to arrange a meeting between Local 1253 officials and his employees, ostensibly to initiate the process of enrolling them in the union. However, when his employees continued to resist, the meeting fell through. Meanwhile, although some of its employees continued to perform inside electrical work, S/L Construction did not pay them union wages or make benefits contributions on their behalves.

Rancourt wrote the chairman of the Committee again on January 3 and 11, 2001,[6] and alleged that S/L Construction was violating provisions of the Inside Agreement pertaining to (1) recognizing Local 1253 as the collective bargaining agent of its employees (Section 2.07); (2) obtaining employees exclusively from the

---

**6.** These letters are identical other than their dates.

Local 1253 hiring hall (Section 4.02); (3) deducting union dues from employees' paychecks (Section 3.08); (4) paying union wages (Section 3.05), and (5) contributing to the union's benefits funds (Sections 5.16, 6.01, 6.02, 6.03, and 6.10). Rancourt and Burton attended a Committee meeting to address these grievances on January 29, 2001. Burton again had the chance to present evidence and argue his position, and he again indicated that S/L Construction had paid union wages to and benefits on behalf of the two Livermore Falls electricians.

The Committee chairman subsequently sent Burton a letter, dated February 5, 2001, reporting the Committee's finding that S/L Construction was in violation of all of the provisions Local 1253 had identified in its grievance. The body of the letter, in its entirety, reads,

> Please be advised that the Labor–Management Committee, having heard the grievance filed by Local Union 1253, IBEW against S/L Construction, Inc., on January 29, 2001, in accordance with Article I, Section 1.07 of the Inside Construction Agreement, has ruled that S/L Construction, Inc. is in violation of Sections 2.07, 3.05, 3.08, 4.02, 5.16, 6.01, 6.02, 6.03, and 6.10 of the Inside Construction Agreement.
>
> Please contact Business Manager Wayne Rancourt in this regard.
>
> Thank you for your attention to this matter.

(*See* Letter dated Feb. 5, 2001 (Joint Ex. 18).)

On April 5, 2001, Local 1253 filed this action seeking to enforce the two Committee awards, pursuant to Section 301 of the Labor–Management Relations Act of 1947 (LMRA), 29 U.S.C. § 141 et seq. Joined as Plaintiffs were the boards of trustees of four benefits funds identified in the Inside Agreement ("the Funds").[7] They allege that S/L Construction's failure to contribute to the Funds violates Section 515 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. As of February 25, 2002, when the Court held a bench trial on these claims, S/L Construction had neither paid the wages specified in the Inside Agreement nor made benefits contributions on behalf of any employee other than the two Local 1253 electricians on the Livermore Falls project.

## III. DISCUSSION

### A. Enforcement of Arbitration Awards Under Section 301 of the LMRA

■ Plaintiffs characterize the Labor–Management Committee's two rulings as binding arbitration awards and request that the Court enforce them against Defendant. Federal labor policy strongly favors arbitration as a means for settling labor disputes. *See, e.g., Misco,* 484 U.S. at 37, 108 S.Ct. 364. Consequently, the Court's review of a labor arbitrator's award must be extraordinarily deferential. *See Major League Baseball Players Ass'n v. Garvey,* 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001); *United Steelworkers of Am. v. Am. Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Georgia–Pacific Corp. v. Local 27, United Paperworkers Int'l Union,* 864 F.2d 940, 944 (1st Cir.1988).

■ Nevertheless, before enforcing an arbitrator's award the Court must make at least two preliminary findings: (1) that the ruling is, in fact, a final and binding arbitration award, *see Gen. Drivers Ware-*

---

**7.** The four Plaintiff Funds are the Local 1253 Health and Welfare Plan, the Local 1253 Money Purchase Pension Plan, the Local 1253 JATC Training Fund, and the Local 1253 Labor–Management Cooperative Committee Fund.

housemen & Helpers, Local Union No. 89 v. Riss & Co., 372 U.S. 517, 519–20, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); and (2) that the parties agreed to submit to arbitration the dispute upon which the arbitrator ruled, see Mobil Oil Corp. v. Local 8– 766, Oil, Chemical & Atomic Workers Int'l Union, 600 F.2d 322, 324 (1st Cir.1979). If these two prerequisites are satisfied, the Court must uphold the award as long as it (3) "draws its essence" from the labor agreement, see W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); and (4) is specific enough to be capable of enforcement, see, e.g., United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597–99, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In this case, Defendant interposes a challenge at nearly every step of this analysis. The Court addresses each in turn.

### 1. Were the Committee's Rulings Arbitration Awards?

The first threshold issue is whether Plaintiffs are correct in characterizing the Committee's proceedings as binding arbitration. "[B]efore a court accepts the 'award' of a grievance committee as the final resolution of a dispute, it must be assured that the decision was intended to and does, by fair and adequate procedures, settle the controversy.'" Elec. Contractors Ass'n of Greater Boston, Inc. v. Local Union 103, Int'l Bhd. of Elec. Workers, 458 F.2d 590, 592 (1st Cir.1972). Plaintiff Local 1253 submitted its grievances to the Committee pursuant to Sections 1.06 through 1.08 of the Inside Agreement. These sections authorize the Committee to hear "all grievances or questions in dispute" and provide for appeal to the Council on Industrial Relations in the event the Committee deadlocks. (See Inside Agt. at §§ 1.06–1.08 (Joint Ex. 2).) The word "ar-

bitration" does not appear in these provisions, and although they provide that the decision of the Council on Industrial Relations will be "final and binding on both parties," they are silent as to whether the Committee's decision is intended to be final and binding. (See id. at § 1.08.) Nevertheless, other courts have concluded that similar or identical provisions authorize joint labor-management committees to issue arbitration awards that are entitled to judicial enforcement. See Tecam Elec. M.V. Inc. v. Local Union 701, Int'l Bhd. of Elec. Workers, No. 01 C 3333, 2001 WL 1338985, at *4 (N.D.Ill. Oct.29, 2001); Int'l Bhd. of Elec. Workers, Local Union No. 124 v. Alpha Elec. Co., 759 F.Supp. 1416, 1420–22 (W.D.Mo.1991); see also Zorn v. K.C. Cmty. Constr. Co., 812 F.Supp. 948, 953 (W.D.Mo.1992); Int'l Bhd. of Elec. Workers, Local 910 v. Roberts, 992 F.Supp. 132, 134–135 (N.D.N.Y.1998) (noting that awards from joint employer-union grievance panels are enforceable in the same manner as arbitration awards). Furthermore, Burton had an opportunity to present evidence on Defendant's behalf at both the Committee meetings, and no evidence at trial suggested that the procedures were otherwise unfair. Finally, it is apparent that the Committee's rulings, which upheld Plaintiff Local 1253's grievances in their entirety, intended to resolve the dispute fully. Therefore, Plaintiffs have properly characterized the procedures described in Sections 1.06 to 1.08 of the Inside Agreement as arbitration proceedings and the Committee's rulings as arbitration awards.

### 2. Did the Parties Agree to Arbitrate this Dispute?

The second preliminary inquiry is whether the parties agreed to submit this particular dispute to arbitration. Mobil Oil, 600 F.2d at 324. "[A]rbitration is a

matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Plaintiff Local 1253's two grievances asked the Committee to determine whether Defendant had violated the Inside Agreement. However, Defendant has conceded from the outset that it did not abide by the terms of the Inside Agreement because it did not believe itself obligated to that agreement. Thus, the crux of the dispute submitted to the Committee was whether Defendant was bound by the terms of the Inside Agreement.

■ Deciding whether the parties agreed to arbitrate a dispute about the validity of the underlying agreement requires the Court to walk the fine line between issues of contract *formation* that it is required to decide and issues of contract *interpretation* that it must leave to the arbitrator. Fortunately, the Court is not the first to face this dilemma. The seminal case in this area is *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), in which the Supreme Court identified an important principle to guide lower courts through this inquiry: arbitration clauses are severable from the remainder of the agreements in which they are contained. *See also Large*, 292 F.3d 49 (discussing *Prima Paint*).[8] "The invalidity of other sections of an agreement neither infects nor undermines the binding force of its arbitration provisions...." *Int'l Union of Operating Engineers, Local Union No. 139 v. Carl A. Morse, Inc.*, 529 F.2d 574, 578 (7th Cir. 1976) (discussing *Prima Paint*). It follows, therefore, that as long as the underlying agreement containing the arbitration clause *exists* and there is no challenge to the validity of that clause itself,[9] a Court must enforce the arbitration clause regardless of whether the parties are bound by any other provision of the agreement. *Prima Paint*, 388 U.S. at 403, 87 S.Ct. 1801. If the arbitration clause grants the arbitrator broad authority, then disputes

---

**8.** *Prima Paint* was a suit brought under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., involving a commercial arbitration clause. 388 U.S. at 396–97, 87 S.Ct. 1801. However, the Court believes the Supreme Court's reasoning in *Prima Paint* is equally instructive in the labor arbitration context. Although the First Circuit has traditionally taken the position that the FAA does not govern labor arbitrations, it nevertheless has treated precedent interpreting the FAA as relevant in labor arbitration cases. *See Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 19 n. 3 (1st Cir.2001); *Derwin v. Gen. Dynamics Corp.*, 719 F.2d 484, 488 n. 4 (1st Cir.1983). Furthermore, the Supreme Court recently settled that the FAA applies not just to commercial contracts but also to employment contracts. *Circuit City Stores v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). The Court also notes that courts in several other jurisdictions have relied on *Prima Paint* in deciding labor arbitration cases similar to the one the Court

faces here. *See Colfax Envelope Corp. v. Local No. 458–3M, Chicago Graphic Communications Int'l Union*, 20 F.3d 750, 754 (7th Cir. 1994); *Int'l Union of Operating Engineers, Local Union No. 139 v. Carl A. Morse, Inc.*, 529 F.2d 574, 578 (7th Cir.1976); *A.M. Castle & Co. v. United Steelworkers of Am.*, 898 F.Supp. 602, 610–12 (N.D.Ill.1995); *Central Missouri Paving Co. v. United Mine Workers of Am., Dist. 14*, 749 F.Supp. 973, 977 (E.D.Mo. 1990); *Makress Lingerie, Inc. v. Int'l Ladies' Garment Workers' Union*, 395 F.Supp. 110, 114–15 (S.D.N.Y.1975).

**9.** Consistent with the principle that the arbitration clause is severable, the Court would also be required to consider any arguments challenging the validity or enforceability of the arbitration clause itself. *Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801. This facet of the *Prima Paint* analysis is irrelevant here, however, since Defendant has not challenged the arbitration clause specifically.

about the enforceability of other provisions in the agreement must be heard by an aribtrator. *See, e.g., A.M. Castle & Co. v. United Steelworkers of Am.,* 898 F.Supp. 602 (N.D.Ill.1995) (following *Prima Paint* and leaving issues of meeting of the minds, fraud in the inducement and negligent misrepresentation to the arbitrator).

### a. Formation of the Underlying Agreement

■ It is for the Court to determine whether Plaintiff Local 1253 and Defendant entered into the underlying agreement. By signing the Letter of Assent, Defendant manifested its intent to enter into a prehire agreement with Plaintiff Local 1253 and be bound by the terms of the Inside Agreement. Generally speaking, a manifestation of mutual assent is sufficient to create an agreement between two parties. *See* Restatement (Second) of Contracts §§ 17(1), 19(3), 21; *cf. NLRB v. Int'l Bhd. of Elec. Workers, Local Union No. 22,* 748 F.2d 348, 350 (8th Cir.1984) (observing that the "crucial inquiry" in the collective bargaining context is whether there is "conduct manifesting an intention to abide and be bound by the terms of an agreement."). Because *actual* intent to enter the agreement is not required, it is not necessary that Burton have read what he signed. *See* Restatement (Second) of Contracts § 23, cmt. b.

In spite of the parties' manifestation of mutual assent, however, the Court must also consider arguments that the agreement either never formed or was void from the outset. *See Large,* 292 F.3d at 49; *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.,* 925 F.2d 1136, 1137–42 (9th Cir.1991). Two of Defendant's profered defenses fall in these categories. First, Defendant argues that it revoked its assent before the agreement became final. Just above the employer's signature line,

the Letter of Assent reads, "SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW." (*See* Letter of Assent (Joint Ex. 1).) Defendant argues that the agreement did not form and was not binding on either party until the international president gave his approval on May 17, 2000. By that time, Burton had already mailed Rancourt the May 15 letter indicating that Defendant did not agree to the terms of the Inside Agreement.

■ However, this "subject to approval" language, standing alone, does not create a condition that must occur before an agreement can form. *Int'l Bhd. of Elec. Workers, Local Union No. 22 v. Electronic Sound,* 268 N.L.R.B. 760, 763, 1984 WL 36016 (1984), *enf'd NLRB v. Int'l Bhd. of Elec. Workers, Local Union No. 22,* 748 F.2d 348 (8th Cir.1984). The approval by the international union was merely a condition subsequent that would have had the effect of terminating the agreement immediately if the international had declined approval. *Id.* at 763–64. Since the international union ultimately gave its approval, however, the agreement formed when Defendant signed the Letter of Assent and did not subsequently terminate by action of the union.

Defendant's second argument challenging the formation of the agreement is that it was void *ab initio* because it was the product of fraud in the execution. *See Southwest Adm'rs, Inc. v. Rozay's Transfer,* 791 F.2d 769, 774 (9th Cir.1986) (citing 12 Williston on Contracts § 1489, at 341–42 (3d ed.1970)) (explaining that successful fraud in the execution defense renders an agreement void *ab initio* ). Fraud in the execution "induces a party to believe the nature of his act is something entirely different than it actually is." *Id.* It occurs when, for example, one party represents that a signature page pertains to one docu-

ment, obtains the other party's signature, and then attaches the signature page to an entirely different document. *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 492 (3d Cir.1994). Defendant points out that Burton asked Plaintiff Local 1253 for only two electricians and argues that he reasonably assumed the document Rancourt delivered in response would be an agreement pertaining only to that request. Defendant argues that by delivering the Letter of Assent and failing to advise Burton that the document reflected something radically different from what the two men had discussed on the telephone, Rancourt engaged in fraud in the execution.

◼ It might appear on first glance that the scenario Defendant describes amounts to fraud in the execution since Burton claims he believed he was merely signing an agreement to hire two men, rather than a prehire agreement. However, in order to prevail on a fraud in the execution defense, Defendant also must demonstrate that Burton's ignorance of the contents of what he signed was *excusable*. *Rozay's Transfer*, 791 F.2d at 774. "[F]raud in the execution arises only where a party 'neither knows *nor has reasonable opportunity to know* of the character or essential terms of the proposed contract.'" *Iron Workers' Local No. 25 Pension Fund v. Allied Fence & Sec. Sys., Inc.*, 922 F.Supp. 1250, 1259 (E.D.Mich.1996) (quoting Restatement (Second) of Contracts § 163 (1981)).

◼ Burton had ample opportunity to read both the Inside Agreement and the Letter of Assent before he signed them. Although the Inside Agreement was fifty-three pages long, Rancourt delivered it to Burton the day before their meeting, and

Burton already possessed at least one copy of the document. Moreover, there is no suggestion that Rancourt rushed him into signing the Letter of Assent. In fact, Burton explained at trial that he simply had a "habit" of not reading agreements that he signed. (*See* Tr. at 85 (Docket # 21).)[10] Because Defendant has not established that Burton's ignorance of the significance of the Letter of Assent and the contents of the Inside Agreement was excusable, it cannot establish that the agreement was void for fraud in the execution. *See Iron Workers'*, 922 F.Supp. at 1259.

◼ Thus, Defendant has failed to prove that the underlying agreement was never formed, and the Court must enforce the arbitration clause it contains. *Cf. Prima Paint*, 388 U.S. at 403, 87 S.Ct. 1801 (noting that FAA instructs federal courts "to order arbitration to proceed once it is satisfied that the making of the agreement for arbitration ... is not in issue") (internal citations omitted). The arbitration provisions of the Inside Agreement are very broad in scope, providing that "[a]ll grievances or questions in dispute" must be submitted to the Committee if the parties cannot resolve them informally. (*See* Inside Agt. at § 1.06 (Joint Ex. 2).) Arbitration provisions of this breadth encompass disputes about the enforceability of the other provisions of the agreement. *See Prima Paint*, 388 at 402–404, 87 S.Ct. 1801; *Makress Lingerie, Inc. v. Int'l Ladies' Garment Workers' Union*, 395 F.Supp. 110, 113–116 (S.D.N.Y.1975). Thus, when the parties formed an enforceable arbitration agreement on May 4, 2000, they agreed to arbitrate disputes about the validity or enforceability of the rest of the Inside Agreement.

---

10. The designation "Tr. at ....." refers to the transcript of the bench trial held February 25, 2002.

### b. Arbitrable Contract Defenses

■ Defendant advances two defenses that challenge the validity—as distinguished from the existence—of the underlying agreement. First, Defendant argues that even if it entered into a prehire agreement with Plaintiff Local 1253, it terminated that agreement in accordance with its terms before Plaintiff Local 1253 invoked the grievance proceedings. When the collective bargaining agreement contains a broad arbitration clause, however, issues of contract termination must be submitted to an arbitrator. *See New England Cleaning Servs., Inc. v. Servs. Employees Int'l Union, Local 254,* 199 F.3d 537, 541 (1st Cir.1999) (citing *Int'l Bhd. of Elec. Workers, Local 1228 v. Freedom WLNE–TV, Inc.,* 760 F.2d 8, 10–11 (1st Cir.1985)); *Rochdale Village, Inc. v. Public Serv. Employees Union, Local No. 80, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 605 F.2d 1290, 1295 (2d Cir.1979). Thus, whether Defendant successfully terminated the agreement was an arbitrable issue, and the Court must defer to the Committee's assessment.

■ Alternatively, Defendant contends that even if Rancourt's behavior in asking Burton to sign the Letter of Assent was not fraud in the execution, it at least amounted to fraud in the inducement. Fraud in the inducement "induces a party to assent to something he otherwise would not have." *Rozay's Transfer,* 791 F.2d at 774 (citing 12 Williston on Contracts, § 1488, at 332). It occurs when, for instance, one party makes false side promises about a written agreement, and those promises induce the other party to execute the agreement. *Gould v. Mobile Concrete Pumping, Inc.,* 865 F.Supp. 619, 623 (W.D.Mo.1994) (citing *Agathos v. Starlite Motel,* 977 F.2d 1500 (3d Cir.1992)). A successful fraud in the inducement defense merely renders an existing agreement

voidable by the recipient of the fraud, rather than void from its inception *See Rozay's Transfer,* 791 F.2d at 774 (citing 12 Williston on Contracts, § 1489, at 341–42); Restatement (Second) of Contracts § 164. Therefore it, like termination, is an arbitrable defense. *See Central Missouri Paving Co. v. United Mine Workers of Am., Dist. 14,* 749 F.Supp. 973, 977 (E.D.Mo.1990); *Makress Lingerie,* 395 F.Supp. at 116; *see also Prima Paint,* 388 U.S. at 404, 87 S.Ct. 1801.

■ Even if the Court were not required to defer to the Committee's assessment of Defendant's fraud in the inducement defense, however, it would find nevertheless that Plaintiff Local 1253 did not fraudulently induce Burton to sign the Letter of Assent. In delivering the Inside Agreement on May 3, Rancourt intended that Burton would look it over before their meeting. At no time did Rancourt represent that the Letter of Assent or Inside Agreement meant anything other than what their written contents indicated. In fact, Burton admitted at trial that *nothing Rancourt said* made him believe the documents pertained only to the two electricians for the Livermore Falls project; he merely assumed this was the case based on similar dealings with other companies. (*See* Tr. at 118 (Docket # 21).)

Given the breadth of the arbitration clause in this case, the Court is satisfied that the Committee was entitled to decide whether Defendant was bound by the sections of the Inside Agreement that Plaintiff Local 1253 identified in its grievances. It also had authority to interpret the agreement and determine whether a breach occurred.

### 3. Merits of Arbitration Award

Because the issues Plaintiff Local 1253 submitted to the Committee were "arbitra-

ble" issues under the Inside Agreement, the Court has virtually no authority to review the merits of the Committee's decision. *United Steelworkers*, 363 U.S. at 598, 80 S.Ct. 1358. "A court cannot vacate an arbitral award as long as the arbitrator is even arguably construing the contract and acting within the scope of his authority." *Providence Journal Co. v. Providence Newspaper Guild*, 271 F.3d 16, 20 (1st Cir.2001) (citing *Misco*, 484 U.S. at 38, 108 S.Ct. 364).

The Committee's rulings in this case are admittedly terse. The letters it sent Burton state only that Defendant was violating certain enumerated provisions of the Inside Agreement. The Committee offered no explanation whatsoever for its findings, but it was not required to do so. *Teamsters Local Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 67 (1st Cir.2000). Even if the Court does not have access to the arbitrator's reasoning in reaching a particular conclusion, it must uphold the award if it can find "any plausible basis for [the arbitrator's] interpretation." *El Dorado Technical Servs., Inc. v. Union General De Trabajadores de Puerto Rico*, 961 F.2d 317, 319 (1st Cir.1992); *accord Crafts Precision Indus., Inc. v. Lodge No. 1836 of Dist. 38, Int'l Ass'n of Machinists & Aerospace Workers*, 889 F.2d 1184, 1185 (1st Cir.1989) ("[W]e shall uphold an arbitrator's interpretation of a contract as long as we can find some plausible argument that favors his interpretation.") (internal citations omitted).

██ Although it is difficult to determine in any detail what the Committee found, the Court concludes that in order to have found Defendant "in violation of" certain provisions of the Inside Agreement, it must have made, at a minimum, four determinations: (1) that the Inside Agreement was enforceable against Defendant; (2) that Defendant's obligations under the Inside Agreement did not terminate before the second hearing on January 29, 2001; (3) that the Inside Agreement applied to Defendant's employees other than the two electricians on the Livermore Falls project;[11] and, lastly, (4) that Defendant failed to fulfill certain of its obligations under the Inside Agreement. Because Defendant has challenged each of these conclusions, the Court considers each briefly to determine whether it was "in any way plausible." *Providence*, 271 F.3d at 20.

As to the first, the Court has no trouble determining that there was a plausible basis on which the Committee could have found that the Inside Agreement was enforceable against Defendant. Defendant's argument to the contrary was that the agreement was fraudulently induced. As discussed above, however, the Court itself would have rejected this defense.

Likewise, there was a plausible basis for the second conclusion, that the Inside Agreement was still in force as of January 29, 2001. To terminate the agreement under its terms, either party was required to "provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter." (*See* Inside Agt. at § 1.02(a) (Joint Ex. 2).) The first Inside Agreement was due to expire on May 31, 2000. A literal reading of Section 1.02(a) would require notice of an intent to withdraw on or before March 2, 2000. In the

---

11. At the time of the second arbitration, the Committee was aware that Defendant had already paid the wages and benefit contributions pertaining to the two electricians on the Livermore Falls project. By finding that Defendant nevertheless was violating the wage and benefits provisions of the Inside Agreement, the Committee implicitly found that Defendant was required to pay wages and benefits for other employees.

Court's view, it is plausible to read Section 1.02(a) literally and conclude that Defendant simply could not terminate the Inside Agreement effective May 31, 2000, because by the time it signed the Letter of Assent on May 4, 2000, the deadline for notifying Plaintiff of its intent to terminate had already passed. If Defendant missed this termination date, it is reasonable to conclude that it became a party to the successor agreement, the Second Inside Agreement, which took effect June 1, 2000, and is not due to expire until May 31, 2003.

Third, as to the Committee's conclusion that Defendant was required to pay wages and benefits on behalf of workers other than the two borrowed electricians, the Court agrees with Defendant that the provision Plaintiff Local 1253 identifies as the union security clause (*see* Inside Agt. at § 2.21 (Joint Ex. 2)) is ambiguous as to whether it requires an employer's existing employees to become members of Local 1253. However, labor arbitrators enjoy wide discretion in interpreting ambiguous contract provisions. *See El Dorado*, 961 F.2d at 319–20. The Court must enforce the award unless it conflicts with "clear and unequivocal" language in the collective bargaining agreement. *Georgia–Pacific*, 864 F.2d at 944; *see Wheelabrator Envirotech Operating Servs., Inc. v. Massachusetts Laborers District Council Local 1144*, 88 F.3d 40, 48 (1st Cir.1996). The conclusion that the Inside Agreement applies to workers other than the two Livermore Falls electricians does not conflict with any clear and unequivocal language in the Inside Agreement. To the contrary, other provisions such as Section 2.07, which acknowledges Local 1253 as "the sole and exclusive representative of *all* [the employer's] employees," certainly could be read to support the Committee's conclusion. (*See* Inside Agt. at § 2.07 (Joint Ex. 2).)

Finally, the Committee found that Defendant violated sections of the Inside Agreement pertaining to withdrawing from the collective bargaining arrangement, negotiating with Local 1253, using the Local 1253 hiring hall, paying union wages and contributing to the Funds. Burton's May 15 letter indicated that Defendant was contemplating refusing to deal with Plaintiff Local 1253 any further. Additionally, the parties stipulated that Defendant did not pay union wages or contribute benefits on behalf of any employee other than the two electricians Local 1253 referred for the Livermore Falls project. These facts alone would provide a plausible basis for the Committee to have concluded that Defendant was violating the enumerated provisions of the Inside Agreement.

### 4. Remedy

 The Committee's awards draw their essence from the collective bargaining agreement, and the Court can conceive of a plausible basis for the decisions it can glean from those awards. Consequently, the Court must enforce the awards and order the remedies the Committee has selected. The Court has no authority to "imply or provide a remedy not specifically set out [by the arbitrator]." *Beer, Soft Drinks, Water, Carbonic Gas & Liquor Sales Drivers v. Vierk Corp.*, 549 F.Supp. 393, 398 (N.D.Ill.1982).

The first remedy that the Committee ordered (following its July 11, 2000, meeting) is straightforward: Defendant was required to "furnish to ... Rancourt the names, telephone numbers and work locations of all current electrical workers as soon as possible." (*See* Letter dated July 18, 2000 (Joint Ex. 13).) It appears that by the time of trial, Defendant already had provided this information to Plaintiffs. However, to the extent that Defendant has not provided the names, telephone num-

bers and work locations of all its electrical workers as of the date of the Committee's letter (July 18, 2000) the Court will order it to do so.

The remedy award that resulted from the January 29, 2001, arbitration is less clear. The Committee's letter dated February 5, 2001, states that the Committee found Defendant in violation of several specific provisions of the Inside Agreement and instructs Burton to "[p]lease contact . . . Rancourt in this regard." (*See* Letter dated Feb. 5, 2001 (Joint Ex. 18).) Although nothing in letter explicitly directs Defendant to pay damages to remedy the violations, the parties, who were present during the Committee's proceedings, both seem to interpret the Committee's letter to mean that "[Burton] was required to pay wages and benefits consistent with the collective bargaining agreement." (*See* Stipulated Facts at ¶ 37 (Joint Ex. 31).) [12]

The Committee's letter does not specify the amount of damages that Defendant is required to pay. Ordinarily, if the exact amount or scope of the remedy is ambiguous, the Court should remand to the arbitrator for clarification. *United Steelworkers of Am., Local 4839 v. New Idea Farm Equip. Corp.*, 917 F.2d 964, 969–70 (6th Cir.1990); *see Locals 2222, 2320–2327, Int'l Bhd. of Elec. Workers v. New England Tel. & Tel. Co.*, 628 F.2d 644, 647 (1st Cir.1980). In this case, however, remand to the arbitrator is unnecessary because the parties have stipulated to the damages calculation that the arbitration award implicates.[13] *Cf. Aluminum Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp.*, 991 F.2d 1545, 1549 (11th Cir.1993) ("*If the parties cannot agree on the amount of backpay,* however, the normal course of action is to . . . remand the dispute to the original arbitrator to clarify the award.") (emphasis added); *Elec. Specialty Co. v. Local 1069, Int'l Bhd. of Electrical Workers*, 222 F.Supp. 314, 315 (D.Conn.1963) ("*[U]nless the parties can stipulate to the amount of back pay due* the employee, the matter must be remanded to the arbitrator. . . .") (emphasis added). They agree that twenty-one of Defendant's employees did work covered by the Inside Agreement and that Defendant's underpayment of wages and benefits on behalf of these employees totaled $370,367.97. (*See* Pls.' Ex. 8–9.)

The Court accepts the parties' characterization of the Committee's February 5, 2001, letter as an instruction to Defendant

---

**12.** For the first time in its post-trial brief, Defendant argues that the Plaintiff Funds have not been damaged by its failure to make contributions because Defendant's employees are not members of Plaintiff Local 1253 and are not eligible to collect benefits from the Funds. Having stipulated to damages at trial, it is late in the day for Defendant to raise this new objection. More importantly, however, the Funds are entitled to the contributions regardless of whether Defendant's employees can ever collect benefits. *See Agathos*, 977 F.2d at 1506.

**13.** The parties indicated repeatedly in preparation for trial that they would try to reach an agreement about damages in time for trial. (*See* Pls.' Mot. for Summ.J. at 13 (Docket # 6); Pls.' Pretrial Memo. at 6 (Docket # 14); Def.'s Pretrial Memo. at 2 (Docket # 15).) At trial Plaintiffs' counsel represented that they agreed to the outstanding wages and benefits due fourteen of Defendant's employees during the period May 2000 to December 2001 and that they were still working on a stipulation as to seven other workers. (*See* Tr. at 42–43 (Docket # 21).) In conjunction with their post-trial brief, Plaintiffs submitted calculations for those seven individuals and represented that the parties had agreed that Defendant would make any objections promptly in writing. (*See* Pls.' Post–Trial Memo. at note 2 (Docket # 23).) On May 8, 2002, Defendant indicated by letter to the Court that it had no objection to Plaintiffs' additional damages submission. (*See* Letter dated May 7, 2002 (Docket # 24).)

to pay damages in accordance with the violation it found. It also accepts their stipulation as to the amount of damages implicated by the award. Therefore, instead of remanding to the Committee to clarify its remedy, the Court will order Defendant to pay back wages to those twenty-one employees and to pay into the Plaintiff Funds on their behalf, in accordance with the stipulated calculations. *Cf. Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 278 (7th Cir.1989) (counseling courts to avoid remanding to the arbitrator for clarification of damages if possible).

## B. ERISA Claims and Attorney Fees

In addition to Plaintiffs' claim for enforcement of the arbitration awards, the Plaintiff Funds also brought this action pursuant to Sections 502 and 515 of ERISA, for Defendant's failure to make contributions in accordance with the terms of the Inside Agreement.[14] 29 U.S.C. §§ 1132, 1145. Together, Sections 502 and 515 create an enforcement action to recover an employer's delinquent contributions to a multiemployer plan. *Id.* The Court's order implementing the arbitration awards resolves the ERISA action in the Funds' favor.

The Plaintiff Funds are entitled to reasonable attorney fees for prevailing on their ERISA claims. 29 U.S.C. § 1132(g)(2)(D). However, the same counsel represented both Plaintiff Local 1253 and the Plaintiff Funds, and the thrust of this action was enforcement of the arbitration awards. The parties have identified no statutory basis for fees in the enforcement action. *See Int'l Bhd. of Elec. Work-*

*ers, Local No. 265 v. O.K. Elec. Co.*, 793 F.2d 214, 216–17 (8th Cir.1986) (noting that attorney fees are not available in suits to enforce arbitration awards) (internal citations omitted). Thus, the Court will award the Plaintiff Funds fees only to the extent that the ERISA claims required additional work above and beyond that which would have been necessary to enforce the arbitration awards had there been no ERISA claims. In their motion for fees, Plaintiffs should identify (1) counsel fees that were paid by the Plaintiff Funds directly, and (2) time counsel spent developing the ERISA claims, excluding time that was necessary to develop Plaintiff Local 1253's Section 301 action.

## C. Equitable Relief

Finally, Plaintiffs have asked the Court to declare that Defendant is still bound by the Inside Agreement and that the Inside Agreement remains in effect until May 31, 2003. As noted above, the Court finds the Committee's conclusion that neither party terminated the agreement prior to the January 29, 2001, arbitration plausible. Beyond that, however, the Court's information about events succeeding that date is simply inadequate to support such a sweeping injunction. Moreover, the Court is wary of interpreting the termination provision of the Inside Agreement, since it finds that to be a task best suited for arbitration. Thus, the Court declines to issue the requested injunctions.

## IV. CONCLUSIONS OF LAW

1. Defendant and Plaintiff Local 1253 entered into a prehire agreement, pursu-

---

**14.** Because the Inside Agreement does not authorize the Funds to initiate arbitration proceedings before the Committee themselves, the Funds were permitted to bring their ERISA claims independent of the outcome of the arbitration. *See Schneider Mov-* *ing & Storage Co. v. Robbins*, 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984); *Am. Fed. of Television & Radio Artists Health & Retirement Funds v. WCCO Television*, 934 F.2d 987, 991 (8th Cir.1991).

ant to 29 U.S.C. § 158(f), when Defendant signed the Letter of Assent on May 4, 2000, and that agreement incorporated the terms of the Inside Agreement.

2. The Inside Agreement required Plaintiff Local 1253 and Defendant to arbitrate their unresolved grievances before the Labor–Management Committee.

3. Defendant and Plaintiff Local 1253 participated in arbitration before the Labor–Management Committee on July 11, 2000, and January 29, 2001, and those proceedings resulted in final and binding awards.

4. The Committee's two awards draw their essence from the Inside Agreement and prescribe remedies that are entitled to enforcement in this Court.

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS Defendant to abide by the arbitration awards reflected in the Committee's letters dated July 18, 2000, and February 5, 2001. Accordingly, it ORDERS Defendant to provide Plaintiff Local 1253 with the names, phone numbers and work locations of its electrical workers from May 4, 2000, up to and including July 18, 2000, to the extent it has not already done so.

It further ORDERS Defendant to pay Plaintiffs damages in the total amount of $370,367.97, plus prejudgment interest, as follows: (1) Defendant is to pay Plaintiff Local 1253 back wages on behalf of the twenty-one employees who did work covered by the Inside Agreement, in the stipulated amounts. Plaintiff Local 1253 shall disburse the back wages to the twenty-one employees as indicated by the stipulation. (2) Defendant is to make contributions into the Funds in the stipulated amounts.

Finally, the Court ORDERS that upon Plaintiffs' motion, to be filed within thirty days, Defendant shall pay the Plaintiff Funds' reasonable attorney fees and costs.

SO ORDERED.